UNITED STATES of America, Plaintiff,

v.

**Michael D. MENARD, Defendant.**

UNITED STATES of America, Plaintiff,

v.

**Michael Lee WALKER, Defendant.**

**Nos. CR 95–4007, CR 95–4008.**

United States District Court,
N.D. Iowa,
Western Division.

Sept. 13, 1995.

Gene A. Wickey of the Law Office of Gene A. Wickey, P.C., Sioux City, Iowa, for defendant Michael Walker.

Michael Hobart, Assistant United States Attorney, Sioux City, Iowa, for U.S.

Nick Drees, Assistant Federal Public Defender, Des Moines, Iowa, for defendant Michael Menard.

**ORDER REGARDING MOTIONS TO SUPPRESS**

BENNETT, District Judge.

## TABLE OF CONTENTS

I. INTRODUCTION AND BACKGROUND ....................................1319

II. FINDINGS OF FACT ..........................................1320

III. CONCLUSIONS OF LAW ...........................................1321
   A. The Vehicle Stop .............................................1321
   B. Search of the Defendants .............................................1321
      1. Search of Defendant Walker .......................................1322
      2. Search of Defendant Menard........................................1323
         a. "Automatic companion" rule and "mere propinquity" .............1323
         b. Propinquity plus more .......................................1327
            i. Officer safety .........................................——
            ii. Subjective and objective grounds for a weapons search.......——
            iii. Intrusiveness of a pat-down search .........................——
         c. Reasonableness of the search of Menard .......................1330

IV. CONCLUSION ..................................................1333

A failure to dim headlights late at night on a highway led to the seizure of weapons and drugs from and arrest of two of the three occupants of a vehicle stopped by a local law enforcement officer. The motions to suppress that resulted from the seizures involve at their core the question of whether the *Terry* pat-down searches of the two male occupants of the vehicle violated Fourth Amendment standards. One of the persons arrested has moved to suppress evidence of the weapon and drugs found on him on the ground that officers had no reasonable suspicion for conducting a pat-down search for weapons. The other person arrested has moved to suppress evidence of the weapon and drugs found on him on the ground that he was patted down as an "automatic companion" of the first person patted down without reasonable articulable suspicion as to him.

### I. INTRODUCTION AND BACKGROUND

A two-count indictment returned on July 12, 1995, charges Defendant Michael D. Menard with one count of possession of meth-amphetamine with intent to distribute in violation of 21 U.S.C. § 841(a)(1), and one count of knowingly using and carrying a firearm during and in relation to a drug trafficking crime in violation of § 924(c). Also on July 12, 1995, a separate one-count indictment was returned against Defendant Michael Lee Walker charging him with being a felon in possession of a firearm in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2).

Both Defendants have moved to suppress evidence discovered as a result of a warrantless search of their persons by law enforcement officers following a traffic stop of the vehicle in which they were both passengers. The Government filed timely resistances to both Defendants' motions, and moved to have the two cases consolidated for the purposes of these pretrial motions. After a hearing on the Government's motion to consolidate, the court granted the Government's request.

On September 6, 1995, the court held an evidentiary hearing on the motions to suppress. The United States was represented by Michael Hobart, Assistant United States Attorney, of Sioux City, Iowa. Defendant

Michael Menard was represented by Nick Drees, Assistant Federal Public Defender, of Des Moines, Iowa. Defendant Michael Walker was represented by counsel Gene A. Wickey of the Law Office of Gene A. Wickey, P.C., in Sioux City, Iowa. At the hearing, the United States presented the testimony of Officers Brad Hawley and Zach Larsen of the Spencer, Iowa, Police Department. Defendants offered no testimony at the hearing. At the conclusion of the hearing, the court informed the parties that they could submit any additional authorities by 4:00 p.m. on September 7, 1995. This matter is now fully submitted.

## II. FINDINGS OF FACT

For the purpose of these motions only, the court finds the following facts:

At approximately 1:50 a.m., on May 2, 1995, Officer Brad Hawley of the Spencer, Iowa, Police Department was patrolling in his police cruiser, a Chevrolet Suburban, on Highway 71 on the north end of Spencer when he met an approaching car which did not dim its high-beam headlights after Officer Hawley had flashed his high-beam headlights at it.[1] Officer Hawley proceeded to stop the vehicle for this most minor of traffic violations. Three people were in the stopped car, a female driver and two male passengers. Lisa Jensen was the driver of the vehicle. Officer Hawley asked for Jensen's driver's license, and Jensen complied. From a prior arrest, Officer Hawley recognized Defendant Walker as the male passenger who was seated on the car's rear seat. In January of 1995, Officer Hawley had arrested Walker for public intoxication and possession of a controlled substance. Defendant Menard was identified as the male passenger on the front seat.

Officer Hawley had previous information from the Iowa Great Lakes Drug Task Force that Walker used drugs and was possibly involved in drug sales. Because of this infor-

mation, Hawley asked Jensen for permission to search the car. Although Jensen was unsure of her authority to grant permission for such a search because the vehicle had been lent to her by Jim Stegman, Jensen gave Hawley permission to search the vehicle. Officer Hawley had the car's occupants exit it so that he could search it. The three individuals stood at the rear of the vehicle. Officer Hawley then commenced a search of the car.[2] Hawley located a knife in his search of the car, but no contraband. While Hawley was searching the vehicle, Officer Zach Larsen arrived as a back-up to Hawley. Hawley stopped his search and went to speak with Larsen. Larsen reminded Hawley that they had received an officer safety warning that Walker was believed to be armed with an automatic pistol. The warning was placed on a clipboard at the Spencer Police Department two or three weeks before the stop and stated that a Deputy Kramer of the Clay County Sheriff's Office had received information from a confidential informant that a Mike Walker was alleged to be carrying a pistol. Based on this information and the officers' concern for their personal safety, the officers decided to pat down Walker for weapons. Hawley informed Walker of their decision to pat him down for weapons. During Hawley's pat down he located a hard object under Walker's right arm. Upon further investigation, the object was determined to be a .32 caliber pistol. Walker was then placed under arrest. Drugs were subsequently found on Walker, as well, but not until after a decision had been made to pat down Menard for weapons.

Once Hawley had arrested and secured Walker, Menard was asked if he too was carrying a weapon. Menard initially denied having a weapon on him. However, upon being informed by Larsen that he was going to pat him down for weapons, Menard admitted that he was carrying a .410 in his pocket. Menard handed over the weapon. He was then placed under arrest and searched. The

---

1. Officer Hawley knew that the southbound vehicle did not have just its low-beams on, because all four front lights remained on when he met it.

2. At this point in time, Officer Hawley had no concern for his personal safety that would have triggered a *Terry*-type pat-down search of any of

these three citizens. Indeed, Hawley was content to have the three occupants of the vehicle stand unattended at the rear of the vehicle while he conducted the vehicle search prior to the arrival of any backup officer.

resulting search revealed that Menard had on his person ten small plastic bags containing a white powder.

Officer Hawley transported Menard to the Spencer Police Department in his vehicle. After Menard was transported, Hawley searched the passenger compartment of his vehicle and found a plastic cigarette wrapper containing a small amount of white powder and a white rock.

## III. CONCLUSIONS OF LAW

### (Including some ultimate findings of fact )

Because of overlap in some of the issues raised in both Defendants' motions, the court will proceed by addressing each of the individual issues raised in the motions *seriatim.* Apart from whether or not Officer Hawley had grounds to stop the vehicle, the court finds each of the issues presented by the motions to suppress to be a very close question.

### A. The Vehicle Stop

Initially, the court must determine an issue raised by Defendant Walker, which is whether Officer Hawley had reasonable suspicion to stop the vehicle in which he was riding. The court concludes that the reasons articulated by Officer Hawley are sufficient to provide a reasonable suspicion justifying an investigative stop of the car driven by Lisa Jensen. " 'Whether the particular facts known to the officer amount to an objective and particularized basis for a reasonable suspicion of criminal activity is determined in light of the totality of the circumstances.' " *United States v. Halls,* 40 F.3d 275, 276 (8th Cir.1994) (quoting *United States v. Garcia,* 23 F.3d 1331, 1334 (8th Cir.1994)); *see United States v. Cummins,* 920 F.2d 498, 501 (8th Cir.1990), *cert. denied,* 502 U.S. 962, 112 S.Ct. 428, 116 L.Ed.2d 448, 449 (1991).

Here, Officer Hawley observed Jensen's vehicle fail to dim its bright lights when approaching an oncoming vehicle, a traffic violation under Iowa law. "It is well established that a traffic violation—however minor—creates probable cause to stop the driver of a vehicle." *United States v. Barahona,*

990 F.2d 412, 416 (8th Cir.1993); *see Pennsylvania v. Mimms,* 434 U.S. 106, 98 S.Ct. 330, 54 L.Ed.2d 331 (1977); *United States v. Hamby,* 59 F.3d 99, 101 (8th Cir.1995); *United States v. Johnson,* 58 F.3d 356, 357 (8th Cir.1995); *Halls,* 40 F.3d at 276; *United States v. Bloomfield,* 40 F.3d 910 (8th Cir. 1994); *Cummins,* 920 F.2d at 500; *United States v. Pillow,* 842 F.2d 1001 (8th Cir.1988). The court is compelled to conclude that Officer Hawley had reasonable suspicion to stop the car in which Walker was a passenger. Indeed, Lisa Jensen, the driver of the vehicle, was issued a citation for failure to dim the headlights and neither Walker nor Menard has suggested that the issuance of that citation was improper or that Jensen did not fail to dim the headlights. The uncontradicted testimony is that Jensen asked Officer Hawley if he had stopped her because she had failed to dim her headlights. The vehicle stop was valid under Fourth Amendment standards.

### B. Search of the Defendants

Both Defendants contest the legality of the officers' search of them. Defendants assert that the officers lacked reasonable suspicion to frisk them for weapons. In *Warren v. City of Lincoln, Neb.,* 864 F.2d 1436 (8th Cir.) (*en banc* ), *cert. denied,* 490 U.S. 1091, 109 S.Ct. 2431, 104 L.Ed.2d 988 (1989), the Eighth Circuit indicated that the Supreme Court has identified three categories of police-citizen encounters, each justifying a different level of detention:

> The first category consists of consensual communications between officers and citizens, involving no coercion or restraint of liberty. Such encounters do not constitute seizures and thus are beyond the scope of the fourth amendment. *See Florida v. Royer,* 460 U.S. 491, 497, 103 S.Ct. 1319, 1323, 75 L.Ed.2d 229 (1983). The second category is the so-called *Terry* stop, *see Terry v. Ohio,* 392 U.S. 1, 21–22, 88 S.Ct. 1868, 1879–80, 20 L.Ed.2d 889 (1968); *Florida v. Royer,* 460 U.S. at 498–99, 103 S.Ct. at 1324–25, pursuant to which an officer having a reasonable suspicion that a person has committed or is about to commit a crime may temporarily seize the

person for limited investigative purposes. Finally, there are full-scale arrests, which must be supported by probable cause. *[United States] v. Poitier*, 818 F.2d 679, 682 [ (8th Cir.1987), *cert. denied*, 484 U.S. 1006, 108 S.Ct. 700, 98 L.Ed.2d 651 (1988).]

*Id.* at 1438–39.

The standards used to consider whether reasonable suspicion exists are well defined, albeit sometimes difficult to apply:

> The standard of articulable justification required by the fourth amendment for an investigative, *Terry*-type seizure is whether the police officers were aware of "particularized, objective facts which, taken together with rational inferences from those facts, reasonably warrant[ed] suspicion that a crime [was] being committed." *United States v. Martin*, 706 F.2d 263, 265 (8th Cir.1983); *see also Terry*, 392 U.S. at 20–21, 88 S.Ct. at 1879–80. In assessing whether the requisite degree of suspicion exists, we must determine whether the facts collectively establish reasonable suspicion, not whether each particular fact establishes reasonable suspicion. "[T]he totality of the circumstances—the whole picture—must be taken into account." *United States v. Cortez*, 449 U.S. 411, 417, 101 S.Ct. 690, 695, 66 L.Ed.2d 621 (1981). We may consider any added meaning certain conduct might suggest to experienced officers trained in the arts of observation and crime detection and acquainted with operating modes of criminals. *See United States v. Wallraff*, 705 F.2d 980, 988 (8th Cir.1983). It is not necessary that the behavior on which reasonable suspicion is grounded be susceptible only to an interpretation of guilt, *id;* however, the officers must be acting on facts directly relating to the suspect or the suspect's conduct and not just on a "hunch" or on circumstances which "describe a very broad category of predominantly innocent travelers." *Reid v. Georgia*, 448 U.S. [438] at 440–41, 100 S.Ct. [2752] at 2754 [65 L.Ed.2d 890 (1980) ]; *United States v. Sokolow*, 831 F.2d 1413 (9th Cir.1987), [*rev'd on other grounds*, 490 U.S. 1, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989) ].

*United States v. Campbell*, 843 F.2d 1089, 1093 (8th Cir.1988); *see United States v. Dawdy*, 46 F.3d 1427 (8th Cir.1995) (holding that "[f]or a *Terry* stop to be considered valid from its inception, 'the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion.' ") (quoting *Terry*, 392 U.S. at 21, 88 S.Ct. at 1880).

■ However, "even in the case of an investigative stop, an officer may take such steps as are 'reasonably necessary to protect [his] personal safety and to maintain the status quo' so that the limited purposes of the stop may be achieved." *United States v. Raino*, 980 F.2d 1148, 1149 (8th Cir.1992) (quoting *United States v. Hensley*, 469 U.S. 221, 235, 105 S.Ct. 675, 684, 83 L.Ed.2d 604 (1985)), *cert. denied*, —— U.S. ——, 113 S.Ct. 1662, 123 L.Ed.2d 280 (1993); *see United States v. Brown*, 51 F.3d 131, 132–33 (8th Cir.1995); *United States v. Jones*, 759 F.2d 633, 636–37 (8th Cir.), *cert. denied*, 474 U.S. 837, 106 S.Ct. 113, 88 L.Ed.2d 92 (1985).

The arguments of the two Defendants for suppression of evidence obtained from the weapons frisks are somewhat different. Therefore, the court will begin its analysis with the frisk of Defendant Walker, then turn to the rather more complicated issues presented by the frisk of Defendant Menard.

### 1. Search of Defendant Walker

■ Applying these principles to evaluate the circumstances known to Officer Hawley at the time he searched Defendant Walker, the court finds that the facts known to Officer Hawley were sufficient to have aroused a reasonable, articulable suspicion on his part that Walker might be armed and therefore pose a serious safety risk to the officers. Hawley had been reminded by Officer Larsen of a safety report which indicated that Walker might be armed with a pistol. As the Eighth Circuit has previously indicated:

> A police officer may search an individual's outer clothing to discover weapons when the officer reasonably believes that the individual may be armed and dangerous. *Terry*, 392 U.S. at 27, 30, 88 S.Ct. at 1883, 1884; *Sibron [v. New York]*, 392 U.S. [40,]

63–64, 88 S.Ct. [1889] at 1903 [20 L.Ed.2d 917] [ (1968) ]. In determining whether the officer acted reasonably in such circumstances, we give due weight "to the specific reasonable inferences which he is entitled to draw from the facts in light of his experience."

*United States v. Ward*, 23 F.3d 1303, 1306 (8th Cir.1994) (quoting *Terry*, 392 U.S. at 27, 88 S.Ct. at 1883). The report that Walker might be armed justified the minimal intrusion of a pat-down search for weapons. *See United States v. Hughes*, 15 F.3d 798, 801 (8th Cir.1994) (holding that where officers had been informed by the confidential informant that defendant often carried a weapon and the officers knew that appellant had been convicted of an earlier weapons violation, officers were justified in conducting a protective pat-down search); *United States v. Bonds*, 829 F.2d 1072, 1074 (11th Cir.1987) (holding that where officer who encountered defendant while he was searching another individual's apartment, and who had been told that defendant often carried a weapon, was entitled to pat down defendant to insure his safety). Therefore, although the question is not free from doubt,[3] the court concludes that the search of Walker was not a violation of the Fourth Amendment.

### 2. Search of Defendant Menard

While the constitutional validity of the pat-down search of Defendant Walker was a close question, that of Defendant Menard presents a much more difficult and closer question yet. Defendant Menard asserts that the pat-down search of him conducted by Officer Hawley was improperly based on his mere presence with Walker. Menard argues that the Eighth Circuit Court of Appeals has rejected the "automatic companion" rule, which allows automatic search of any companion of a person officers may have grounds to search.

### a. "Automatic companion" rule and "mere propinquity"

Menard's argument for suppression is based on the decision of the Eighth Circuit Court of Appeals in *United States v. Flett*, 806 F.2d 823 (8th Cir.1986). In *Flett*, police officers executed an arrest warrant for a person named Jacobson, whom they believed to be armed and dangerous, at Jacobson's trailer home. *Flett*, 806 F.2d at 825. Upon entering the home, officers found, in addition to Jacobson, Flett, Flett's wife, and two small children. *Id.* Flett was dressed in attire similar to Jacobson's, which officers believed indicated membership in a gang called the Sons of Silence. *Id.* Officers immediately conducted a pat-down search of Flett as well as Jacobson. *Id.* The search of Flett revealed a knife and a derringer pistol containing live ammunition. *Id.* The court considered the reach of the *Terry* exception, which finds a warrantless search may be justified by "specific and articulable facts" and "ra-

3. The court is troubled by the Government's failure to produce the officer safety report, or a copy thereof, and has some suspicion that the officer safety warning may be an after the fact justification for the weapons pat downs. Describing the warning as "an officer safety report" suggests something far more formal than the testimony here actually describes the warning to be. The testimony of the officers was not that there was a formal report sharing information among local law enforcement agencies, but instead a "highlighted," hand-written note stuck to a bulletin board or clipboard stating that an officer had received information about a certain person with a brief description of what the warning is. The Government did not produce any witness, apart from the officers involved, who could verify the existence the report relied on in this case, nor did it produce Deputy Kramer, who purportedly was the source of the warning, to testify as to the basis for the warning. However, there is no objectively reasonable, articulable evidentiary basis in this record to disbelieve completely the officers' testimony that such a document existed at one time, so the court concedes that its subjective suspicions may not be objectively reasonable based on the evidentiary record here.

Nonetheless, the court has some concerns about basing reasonable suspicion on an officer safety warning in turn purportedly based on confidential information that apparently has not been subjected to any test for corroboration or reliability, that may contain multiple layers of hearsay, and that may have been somewhat stale, by a few weeks, by the time the officers here purportedly acted pursuant to it. However, the information available in this record seems to fall somewhere between that available to officers in *Hughes*, 15 F.3d at 801, and that available in *Bonds*, 829 F.2d at 1074. Furthermore, the pat-down search conducted pursuant to the warning was minimally intrusive to protect the officers' safety. *United States v. McMurray*, 34 F.3d 1405, 1411 (8th Cir.1994).

tional inferences" from those facts, to a search of the companion of an arrestee:

In *Ybarra v. Illinois*, 444 U.S. 85, 100 S.Ct. 338, 62 L.Ed.2d 238 (1979), the Court refused to uphold the search of a patron of a bar who happened to be present when the police arrived to conduct a search of the bar pursuant to a valid search warrant. The Court noted that a person's mere propinquity to others independently suspected of criminal activity does not, without more, give rise to *probable cause* to search that person. *Id.* at 91, 100 S.Ct. at 342 (emphasis added)....

Several circuits have addressed the question of a limited search of the companion of an arrestee. These circuits have upheld such a search finding that:

[A]ll companions of the arrestee within the immediate vicinity, capable of accomplishing a harmful assault on the officer, are constitutionally subjected to the cursory "pat-down" reasonably necessary to give assurance that they are unarmed.

*United States v. Berryhill*, 445 F.2d 1189, 1193 (9th Cir.1971). *See also, United States v. Poms*, 484 F.2d 919, 922 (4th Cir.1973) (per curiam); *United States v. Simmons*, 567 F.2d 314 (7th Cir.1977).

The Sixth Circuit has explicitly rejected this "automatic companion" rule in *United States v. Bell*, 762 F.2d 495, 498 (6th Cir. 1985), [*cert. denied*, 474 U.S. 853, 106 S.Ct. 155, 88 L.Ed.2d 128 (1985) ]. The court in *Bell* found that the "automatic companion" rule extended the *Terry* requirement of a reasonably suspicion too far. *Id.* at 499. This rule allows officers the freedom to conduct a cursory pat-down search regardless of the individual circumstances presented in each case. This appears to be in direct opposition to the Supreme Court's directions in both *Terry* and *Ybarra* that the officers articulate specific facts justifying the suspicion that an individual is armed and dangerous. We decline to adopt the "automatic companion" rule.

*Flett*, 806 F.2d at 827. Instead, the Eighth Circuit Court of Appeals in *Flett* applied a "totality of the circumstances" analysis, in which companionship alone is not enough to justify a frisk, but companionship is "certain-

ly ... one [circumstance] to be considered in determining the overall reasonableness of the officer's actions." *Id.* (citing *Bell*, 762 F.2d at 502).

Applying this "totality of the circumstances" analysis, the court in *Flett* found the search of Flett constitutional under *Terry*. First, the officer knew that an arrest warrant had been issued for Flett's companion, Jacobson, on narcotics charges; second, Jacobson was a known member of a motorcycle gang with "violent propensities," including use of firearms; third, Flett was dressed in attire similar to Jacobson's, which, although inadequate alone, when taken together with Flett's presence in the home of a known gang member charged with narcotics violations, gave rise to a reasonable inference that Flett might also be a gang member, and therefore armed and dangerous. *Id.* at 827–28. The court observed that

[t]he focus of the judicial inquiry is not whether the officer had an indication that the person [was] armed [and] dangerous, but rather, whether the officer reasonably perceived the subject of the frisk as potentially dangerous.... The issue is "whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." *Terry v. Ohio*, 392 U.S. at 27, 88 S.Ct. at 1883.

*Flett*, 806 F.2d at 828. The court noted that the officers arresting Jacobson had no way to exclude Flett from the scene, but were already confronted with him in the residence, and the arresting officers could articulate specific facts which, along with the reasonable inferences drawn therefrom, and the officers' personal experience, supported the reasonableness of the pat-down search of Flett. *Id.* at 828–29.

In a case cited by the court in *Flett* that is more closely related to the circumstances presented here, the court found that the arresting officer had reasonable suspicions justifying the pat-down search of a companion of an arrestee. *United States v. Tharpe*, 536 F.2d 1098, 1100–01 (5th Cir.1976) (*en banc* ). In *Tharpe*, the officer was seeking a person named Hester in connection with a felony committed some hours earlier and,

upon stopping Hester's vehicle, found the Tharpes inside:

> That officer Martin faced substantial indications of possible danger to himself because the Tharpes might likely be armed can hardly be questioned. He was alone, at night, in a poorly lit area, facing three men who had evidently been drinking. He had arrested the Tharpes' companion. He had information that the Tharpe brothers were known burglars; that they were now suspects in a recent unsolved burglary; that they were that very moment present as passengers with a man sought on a felony committed just hours earlier.
>
> ... [Officer Martin's] subjective feelings may have been equivocally expressed, but his testimony clearly shows that he felt a risk of danger, and had a subjective awareness of facts justifying such an apprehension. This satisfies the principle posited by *Terry* as authorizing "a reasonable search for weapons for the protection of the police officer where he had reason to believe that he is dealing with an armed and dangerous individual." 392 U.S. at 27, 88 S.Ct. at 1883. We hold that the protective pat-down was a proper and prudent police procedure. *United States v. Poms,* 4 Cir.1973, 484 F.2d 919, 921; *United States v. Green,* 1972, 151 U.S.App.D.C. 35, 465 F.2d 620, 623–23; *United States v. Berryhill,* 9 Cir.1971, 445 F.2d 1189, 1193; *cf. United States v. Del Toro,* 2 Cir.1972, 464 F.2d 520, 521–22.

*Tharpe,* 536 F.2d at 1100–01.

The theme in *Tharpe* and *Flett* that an officer may conduct a reasonable search of companions of an arrestee in order to ensure the officer's safety, as long as "mere propinquity" is not the only ground for the search, was reiterated in *United States v. Whitfield,* 907 F.2d 798 (8th Cir.1990). In *Whitfield,* two police officers stopped a car after the driver ignored a stop signal, and arrested the driver because he did not have a valid driver's license. *Whitfield,* 907 F.2d at 799. When the driver's companion stepped out of the car, officers saw that he was wearing a bulletproof vest and had a suspicious bulge under his vest. *Id.* The court cited *Terry* and *Flett* for the proposition that "[a]n officer may conduct a pat down search for self-protection during an arrest, including a search of the arrestee's companion." *Id.* (citing *Terry,* 392 U.S. at 27, 88 S.Ct. at 1883; *Flett,* 806 F.2d at 826–27). The court found that the pat-down search of the companion in that case was justified "when the officer saw Whitfield's bulletproof vest with a gun-like bulge underneath." *Id.* at 799–800.

Rejection of the "automatic companion" rule is general, but by no means unanimous. However, decisions adopting the rule were rendered prior to the Supreme Court's decision in *Ybarra v. Illinois,* 444 U.S. 85, 100 S.Ct. 338, 62 L.Ed.2d 238 (1979), upon which this circuit's *Flett* decision is largely based. *See, e.g., United States v. Simmons,* 567 F.2d 314 (7th Cir.1977) (adopting, with limitations, the "automatic companion" rule of *United States v. Berryhill,* 445 F.2d 1189 (9th Cir. 1971)); *United States v. Poms,* 484 F.2d 919, 922 (4th Cir.1973) (accepting "automatic companion" rule as stated in *Berryhill* ); *United States v. Berryhill,* 445 F.2d 1189, 1193 (9th Cir.1971) ("All companions of the arrestee within the immediate vicinity, capable of accomplishing a harmful assault on the officer, are constitutionally subjected to" a pat-down search). However, every one of those decisions adopting the "automatic companion" rule find that the *search* must be carefully limited to items within the companion's immediate control and should most often be limited to a "cursory" pat-down reasonably necessary to give assurance that the companions of the arrestee are not armed. *See Simmons,* 567 F.2d at 318–20 (7th Cir.1977) (finding the search of a companion resulting from the "automatic companion" rule should be limited to area of companion's immediate control, and thus safety interest is served by "cursory 'pat-down' reasonably necessary to give assurance that [the companions] are unarmed"). Another decision, while ostensibly adopting the rule from *Berryhill,* justified its application by pointing to circumstances involving more than mere companionship. *See, e.g., Poms,* 484 F.2d at 922 ("[W]e see no reason why officers may not similarly engage in a limited search for weapons of a known companion of an arrestee, especially one reported to be armed at all times, who walks in

on the original arrest by sheer happenstance.").

Decisions like *Flett*, which reject the "automatic companion" rule, also base their decision in part on the holding in *Ybarra v. Illinois*, 444 U.S. 85, 91, 100 S.Ct. 338, 342, 62 L.Ed.2d 238 (1979), that "a person's mere propinquity to others independently suspected of criminal activity does not" by itself constitute probable cause to search or reasonable suspicion to frisk a companion of the arrestee. Among the earliest decisions explicitly to reject the "automatic companion" rule was the decision of the Sixth Circuit Court of Appeals in *United States v. Bell*, 762 F.2d 495 (6th Cir.), *cert. denied*, 474 U.S. 853, 106 S.Ct. 155, 88 L.Ed.2d 128 (1985), which relied on *Ybarra* as follows:

> As to the propriety of the "automatic companion" rule, we do not believe that the *Terry* requirement of reasonable suspicion under the circumstances, 392 U.S. at 27, 88 S.Ct. at 1883, has been eroded to the point that an individual may be frisked based upon nothing more than an unfortunate choice of associates. The Supreme Court has "invariably held [that] the predicate to a patdown of a person for weapons" is "a reasonable belief that he was armed and presently dangerous." *Ybarra*, 444 U.S. at 92–93, 100 S.Ct. at 342–343 (footnote and citations omitted)[.] [A]nd the court was, in *United States v. Di Re*, 332 U.S. 581, 587, 68 S.Ct. 222, 225, 92 L.Ed. 210 (1948), "not convinced that a person, by mere presence in a suspected car, loses immunities from search of his person to which he would otherwise be entitled." ... An "automatic companion" rule is inconsistent with the Supreme Court's observation that it "has been careful to maintain [the] narrow scope" of *Terry's* exception to the warrant requirement. *Dunaway v. New York*, 442 U.S. 200, 210, 99 S.Ct. 2248, 2255, 60 L.Ed.2d 824 (1979).

*Bell*, 762 F.2d at 499. In *Bell*, the court found that seizure of a handgun from a companion of the arrestee could not be based solely on the companion's presence in the arrestee's vehicle. *Id.* The court then found that the totality of the circumstances, including companionship, justified the search for and seizure of the weapon. *Id.* at 499–502.

Since the decisions in *Bell* and *Flett*, a plethora of cases has held that "mere propinquity" is insufficient basis for the search of a companion of an arrestee, but the circumstances, including companionship, may support such a search. Recent decisions are demonstrative of this trend. *See, e.g., United States v. Martinez–Molina*, 64 F.3d 719 (1st Cir.1995) (citing *Ybarra* and *Sibron v. New York*, 392 U.S. 40, 62, 88 S.Ct. 1889, 1902, 20 L.Ed.2d 917 (1968), for the proposition that "mere propinquity" or presence in the company of known criminals is insufficient basis for search or arrest of companion; "the cases in which courts find that probable cause [to arrest the companion] exists generally involve substantially more than a momentary, random, or apparently innocent association between the defendant and the known criminal activity"); *United States v. Vizcarra–Martinez*, 57 F.3d 1506, 1511 (9th Cir.1995) (*Ybarra* prevents finding "probable cause" for a search based on "mere propinquity," but in the case before the court the defendant "was not merely observed associating with those suspected of criminal activity; his own actions, and other facts known to the police, strongly suggested that he was delivering hydriodic acid and therefore was not an 'innocent visitor' "); *Swint v. City of Wadley, Ala.*, 51 F.3d 988, 997–99 (11th Cir. 1995) (finding that *Ybarra* does not allow search of all occupants of premises based on probable cause to arrest one suspect, "or even probable cause to believe that a number of other or unidentified people" were involved in the criminal activity in the premises, and finding no further basis for search and arrest of the civil rights plaintiff present in the premises); *United States v. Tehrani*, 49 F.3d 54, 59 (2d Cir.1995) (more than companionship is required for probable cause to arrest the arrestee to "taint" the companion); *United States v. Chairez*, 33 F.3d 823, 826 (7th Cir.1994) ("mere propinquity" is not enough, citing *Ybarra*, and nothing else but presence in a vehicle driven by someone else and owned by a third person during a drug transaction demonstrated the defendant-companion's knowledge that a gun was present under his seat); *Hummel–Jones v. Strope*, 25

F.3d 647, 651 (8th Cir.1994) (focus is on relationship between a visitor and the place, and whether that relationship is such that it is reasonable for searchers to extend search to visitor's person; mere presence is not enough); *United States v. Reid,* 997 F.2d 1576, 1578 (D.C.Cir.1993) (citing *Ybarra* for proposition that mere presence in a public place is not enough, but finding circumstances distinguished case from search based on mere presence, because "[c]ommon sense suggests that there is a much greater likelihood that a person found in a small private residence containing drugs will be involved in the drug activity occurring there than an individual who happens to be in a public tavern where the bartender is suspected of possessing drugs. Police officers are not blind to these realities and we should not encourage them to be," but refusing to adopt a general rule that police officers executing a warrant to search for drugs should be able to search everyone on the premises for weapons), *cert. denied,* —— U.S. ——, 114 S.Ct. 1105, 127 L.Ed.2d 417 (1994); *United States v. Holder,* 990 F.2d 1327, 1329, 301 U.S.App. D.C. 57 (D.C.Cir.1993) (mere propinquity is not sole basis and situation is distinguishable from *Ybarra* when companion is present in a private apartment just a few feet from a table full of cocaine, such that grounds for suspecting the arrestee applied almost equally to the companion); *United States v. Halliman,* 923 F.2d 873, 882 (D.C.Cir.1991) (more than "mere propinquity" is involved when person searched is present at the time of the criminal activity and the activity is such that it cannot normally be carried on without the knowledge of all present); *United States v. Chaidez,* 919 F.2d 1193, 1200 (7th Cir.1990) (the "mere propinquity" holding of *Ybarra* is inapplicable when "we have more"), *cert. denied,* 501 U.S. 1234, 111 S.Ct. 2861, 115 L.Ed.2d 1028 (1991), and *cert. denied,* 502 U.S. 872, 112 S.Ct. 209, 116 L.Ed.2d 167 (1991).

### b. *Propinquity plus more*

■ Because the court of appeals of this circuit has expressly rejected the "automatic companion" rule, requiring instead that the search of a companion of an arrestee be reasonable in the "totality of the circumstances," *including* companionship with the arrestee, *Flett,* 806 F.2d at 827, this court must determine whether the search of Menard was an "automatic companion" or "mere propinquity" search, or was instead a search justified under the totality of the circumstances. In short, what more, if anything, than presence do we have on which to base the validity of the pat-down search of Menard?

The District of Columbia Circuit Court of Appeals was presented with a similar question in *United States v. McKie,* 951 F.2d 399, 292 U.S.App.D.C. 419 (D.C.Cir.1991). In *McKie,* the court distinguished between an "automatic companion" or "mere propinquity" search and one based on adequate grounds for reasonable suspicion on whether the search of the companion "had an independent foundation." *McKie,* 951 F.2d at 402. The court found a number of factors providing such an "independent foundation" in the case before it. *Id.* First, the companion "was observed" walking with and talking to a suspected drug dealer at the very time and in the very place of the suspected drug dealing. *Id.*[4] Second, the police had a precise and reliable tip that the arrestee would be conducting an illegal drug sale at the time and place when the companion was found to be present. *Id.* Third, officers observed behavior consistent with a drug sale in progress between the companion and the arrestee. *Id.* The court observed, however, that "there was more":

> Detective O'Neal saw McKie [the companion] and Clipper [the arrestee] get in Clipper's car together and drive away. This certainly indicated that McKie's relationship with Clipper was more than simply incidental and transient, since "one would expect that persons in a ... car are there by invitation or consent" and are not mere strangers. *United States v. Vaughan,* 718

---

4. The court observed that this circumstance, the companion's presence at the very time and very place of the suspected drug dealing, meant that the government was not asking the court to "al-

low the police to use suspected criminals as 'roving warrants' justifying *Terry* stops of all their companions." *McKie,* 951 F.2d at 402.

F.2d 332, 335 n. 6 (9th Cir.1983). The informant, moreover, had told O'Neal that Clipper stored his drug supply in that very car. Thus, under the circumstances, once Clipper and McKie entered the car, we believe the police had adequate reason to stop the car and to detain and question McKie briefly.

*McKie,* 951 F.2d at 402 (cocaine subsequently found in plain view without pat-down search).[5]

In *United States v. Tehrani,* 49 F.3d 54 (2d Cir.1995), the Second Circuit Court of Appeals considered the circumstances under which "reasonable suspicion created by one person can 'taint' another individual." *Tehrani,* 49 F.3d at 59. The court extracted the following factors from its prior cases:

(1) the nature of the place in which the intrusion occurred, that is, public or private, and (2) whether the individual himself was behaving suspiciously or whether he was tainted by the behavior of another. [*United States v. Jaramillo,* 25 F.3d 1146, 1151–53 (2d Cir.1994) ]. The *Jaramillo* court distinguished the case before it, involving a defendant "stopped in a public place and who had no known connection with the only person whom the officers had articulable grounds to suspect of wrongdoing," from cases in which the circumstances gave rise to "sufficiently 'specific and articulable facts' to warrant the stop and patdown of an individual. . . ." *Id.* at 1151.

*Tehrani,* 49 F.3d at 59. In *Tehrani,* the court found that in addition to travelling together, grounds justifying the companion's arrest were that the arrestee had lied about how he entered the country and whether he was alone, and had been hostile during questioning, and the companion had also been unable to say how he entered the country and had contradicted the arrestee's statement about travelling alone. *Id.* at 60. Similarly, the District of Columbia Circuit Court of Appeals has required that in addition to

presence in or near the premises in which illegal activity is suspected to be taking place, in order to search a person an officer must have a reasonable and articulable concern about the officer's safety and that of the officer's colleagues. *Reid,* 997 F.2d at 1579. In *United States v. Halliman,* 923 F.2d 873, 882 (D.C.Cir.1991), the additional circumstances, besides association of individuals, justifying search of a companion, was whether the association was contemporaneous with the criminal activity and whether the nature of the criminal activity was such that it could not normally be carried on without the knowledge of all persons present.

*i. Officer safety.* The court is mindful that, in the circumstances of this case, the search of Walker and subsequently of Menard was primarily, if not solely, motivated by a concern of the officers for their personal safety. They had received an officer safety warning advising them of the likelihood that Walker was armed and did in fact find a weapon on Walker. Finding the weapon on Walker prompted the pat-down search of Menard. The court therefore believes it is appropriate to examine briefly the grounds upon which officers may conduct a safety search in the course of an investigative stop.

■ Decisions of this circuit make plain that in an investigative stop, officers

"should [use] the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time," *Florida v. Royer,* 460 U.S. 491, 500, 103 S.Ct. 1319, 1325, 75 L.Ed.2d 229 (1982 [1983] ), but "an officer may take such steps as are 'reasonably necessary to protect [the officer's] personal safety and to maintain the status quo' so that the limited purposes of the stop may be achieved," [*United States v.] Raino,* 980 F.2d [1148,] 1149 (quoting *United States v. Hensley,* 469 U.S. 221, 235, 105 S.Ct. 675, 684, 83 L.Ed.2d 604 (1985)).

---

5. In *United States v. Meadows,* 885 F.Supp. 1 (D.D.C.1995), the district court found that, unlike its circuit court of appeals in *McKie,* it was confronted with a pure "automatic companion" rule case. *Meadows,* 885 F.Supp. at 2–3. The district court's rejection of the rule was founded

on its concern that it would allow the police to "piggyback," and make lawful, frisks of companions, with no independent, articulable basis, onto any frisk revealing a weapon, even if the first frisk to reveal a weapon was itself unlawful. *Id.* at 3.

*United States v. Brown*, 51 F.3d 131, 132–33 (8th Cir.1995); *United States v. McMurray*, 34 F.3d 1405, 1411 (8th Cir.1994) (test is whether officer's conduct was " 'reasonably necessary to protect [the officer's] personal safety and to maintain the status quo,' " also quoting *Raino*, 980 F.2d at 1149), *cert. denied*, —— U.S. ——, 115 S.Ct. 1164, 130 L.Ed.2d 1119 (1995); *United States v. Watts*, 7 F.3d 122, 125 (8th Cir.1993) (quoting *Hensley*, 469 U.S. at 235, 105 S.Ct. at 684), *cert. denied*, —— U.S. ——, 114 S.Ct. 895, 127 L.Ed.2d 88 (1994); *United States v. Thomas*, 992 F.2d 201, 203–04 (8th Cir.1993) (same rule, quoting *United States v. Saffeels*, 982 F.2d 1199, 1205 (8th Cir.1992), in turn quoting *Hensley*, 469 U.S. at 235, 105 S.Ct. at 683).

    ■    *ii.   Subjective  and  objective grounds for a weapons search.* The court turns next to a more detailed consideration of what standards apply to determining the constitutionality of a weapons pat down. In evaluating the validity of an investigative stop or a pat-down search conducted in the course of such a stop, the court

> must consider the "totality of the circumstances—the whole picture." *United States v. Sokolow*, 490 U.S. 1, 8, 109 S.Ct. 1581, 1585, 104 L.Ed.2d 1 (1989) (quoting *United States v. Cortez*, 449 U.S. 411, 417, 101 S.Ct. 690, 695, 66 L.Ed.2d 621 (1981)). Reasonable suspicion must derive from more than an "inchoate and unparticularized suspicion or 'hunch.' " *Terry v. Ohio*, 392 U.S. 1, 27, 88 S.Ct. 1868, 1883, 20 L.Ed.2d 889 (1968). . . .
>
> We . . . consider[ ] whether there [is] a reasonable articulable suspicion to justify an investigatory stop or seizure.

*United States v. Green*, 52 F.3d 194, 198 (8th Cir.1995). Whatever the officer's subjective suspicions may be, to be reasonable, those suspicions must be based on objective facts articulable by the officer performing the search. *See, e.g., Sokolow*, 490 U.S. at 7, 109 S.Ct. at 1585 (based upon the totality of the circumstances, not individual facts, the seizing officer must have a "minimal level of objective justification" which the officer can articulate); *United States v. Bloomfield*, 40 F.3d 910, 919 & n. 10 (8th Cir.1994) ("subjec-

tive perceptions" of officers may be factors supporting reasonable suspicion, but suspicion must be objectively reasonable and articulable), *cert. denied*, —— U.S. ——, 115 S.Ct. 1970, 131 L.Ed.2d 859 (1995); *McDonell v. Hunter*, 809 F.2d 1302, 1307 (8th Cir.1987) (reasonable suspicion must be based on "specific objective facts and rational inferences. [officers] are entitled to draw from those facts in light of their experience"); *see also Justice v. City of Peachtree City, Ga.*, 961 F.2d 188, 194 (11th Cir.1992) (officers must possess a "particularized and objective basis" for suspecting that contraband is hidden on a subject's person).

    ■  In *United States v. Jones*, 990 F.2d 405 (8th Cir.), *cert. denied*, —— U.S. ——, 114 S.Ct. 350, 126 L.Ed.2d 314 (1993), the Eighth Circuit Court of Appeals considered whether an officer must have a subjective belief in the reasonableness of the search:

> Jones contends that even if the facts support reasonable suspicion, we cannot now justify the detention of the luggage on this ground because Sola and Scudder [the seizing officers] did not believe they had reasonable suspicion when they detained the luggage. We disagree. Because we decide whether reasonable suspicion justifies a detention based on all the objective facts, we are not limited by the detaining officer's subjective opinions. *See Klingler v. United States*, 409 F.2d 299, 304 (8th Cir.), *cert. denied*, 396 U.S. 859, 90 S.Ct. 127, 24 L.Ed.2d 110 (1969); *United States v. McKie*, 951 F.2d 399, 402 (D.C.Cir.1991) (per curiam). Thus, our conclusion that reasonable suspicion existed justifies Sola and Scudder's detention of the luggage regardless of the detective's beliefs.

*Jones*, 990 F.2d at 406; *and compare United States v. Thompson*, 712 F.2d 1356, 1361 (11th Cir.1983) ("Although a subjective suspicion of criminality is arguably indispensable in justifying a warrantless search, *see DiPasquale v. State*, 43 Md.App. 574, 406 A.2d 665, 667 (1979); 1 LaFave, Search and Seizure Sec. 3.2(b) (1978 & Supp.1983), we do not decide whether an actual suspicion is required. Applying an objective test, we conclude that the facts of which Kier was aware when he retained Thompson's driver's

license were insufficient to support a reasonable suspicion of criminal activity."). Thus, objective facts may give rise to a reasonable suspicion, even if the officers involved did not have a subjective belief concerning the reasonableness of the search. In another case, the Eighth Circuit Court of Appeals observed, quoting *Terry*, 392 U.S. at 21–22, 88 S.Ct. at 1880, that

> It is imperative that the facts be judged against an objective standard: would the facts available to the officer at the moment of the seizure or search "warrant a man of reasonable caution in the belief" that the action taken was appropriate?

*United States v. Wantland*, 754 F.2d 268, 270 (8th Cir.1985).

■■■ If a driver's statement that he has a weapon in the vehicle is sufficient to warrant a search of the vehicle, because it is reasonable for officers to believe that the driver may gain control over the gun, *Thomas*, 992 F.2d at 204, it would seem to follow that finding a weapon on one occupant of a vehicle is sufficient basis for an officer's suspicion that other persons in the vehicle may have access to weapons, and should be searched. The test again, is "whether a reasonably prudent [person] in the circumstances would be warranted in the belief that his safety or that of others was in danger." *United States v. Douglas*, 964 F.2d 738, 741 (8th Cir.1992) (quoting *Terry*, 392 U.S. at 27, 88 S.Ct. at 1883). Such circumstances exist where an officer is alone with a person late at night and the person's attire is such that the officer cannot tell whether the person is armed or not, and therefore determines that a pat-down search is appropriate to protect the officer's own safety. *Id.* An immediate attempt to locate any weapons, once circumstances indicate a weapon may be present, is required by the interests of public and police safety. *United States v. Knox*, 950 F.2d 516, 519 (8th Cir.1991).

■■■ *iii. Intrusiveness of a pat-down search.* A pat-down search is recognized as a reasonable step to ensure the safety of the officers during an investigative stop where officers have a reasonable belief that weapons may be present. *McMurray*, 34 F.3d at 1411 (pat-down for weapons reasonable, because reasonable to believe weapons are present when person searched is suspected of dealing drugs, because "weapons and violence are frequently associated with drug transactions," quoting *United States v. Brown*, 913 F.2d 570, 572 (8th Cir.), *cert. denied*, 498 U.S. 1016, 111 S.Ct. 590, 112 L.Ed.2d 594 (1990)). Furthermore, incident to a valid *Terry* stop, an officer may search "the passenger compartment of an automobile, limited to those areas in which a weapon may be placed or hidden ... if the police officer possesses a reasonable belief based on 'specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant' the officer in believing that the suspect is dangerous and the suspect may gain immediate control of weapons." *Watts*, 7 F.3d at 125 (quoting *Michigan v. Long*, 463 U.S. 1032, 1049, 103 S.Ct. 3469, 3481, 77 L.Ed.2d 1201 (1983), in turn quoting *Terry*, 392 U.S. at 21, 88 S.Ct. at 1880); *Thomas*, 992 F.2d at 203–04.

### c. Reasonableness of the search of Menard

In the present case, the court is troubled that undoubtedly the circumstance upon which the government relies most heavily as justifying the search of Menard is his companionship with Walker, and Walker was discovered to be armed.[6] However, under *Flett,*

---

6. Over and over in their testimony at the suppression hearing, the officers stated that the circumstance they relied upon in deciding to search Walker was the belated recollection by one of the officers of the officer safety report that Walker might be armed, and from the discovery of the weapon on Walker they also determined that they should search Menard. *See, e.g.,* Suppression Hearing Transcript, pp. 11 (A [Hawley]: I told him that I had found a knife, and then he looked at the IDs and told me that—asked if I remembered the officer safety warning we had gotten on Walker.), 12–13 (A [Hawley]: We decided, for our safety, to pat him [Walker] down.), 19 (Q [by AUSA]: Did you ever see Mr. Larsen—or officer Larsen pat down Mr. Menard prior to finding or having the firearm retrieved from Mr. Menard? A [Hawley]: No. Q: What did you observe concerning the retrieval of that firearm? A: Menard was told that we were going to pat him down also, and asked if he had any weapons, which he said no. Then he was told again that he was going to be patted down, and he told us that he had a .410 under his jacket).

In fact, Officers Hawley and Larsen specifically discounted any other circumstances as figuring in their suspicions that Menard might be armed. *See, e.g.,* Suppression Hearing Transcript, pp. 27 (Q [by defense counsel]: [N]o one had made any furtive gestures, had they? A [Hawley]: I don't understand furtive. Q: You don't understand furtive gestures. Like making a suspicious move of some sort. A: No, they didn't. Q: And no one had really done anything to arouse any suspicion in your mind of criminal activity going on, aside from the failure to dim the headlights, right? A: Right. Q: And you had no reason to fear for your safety at that point right? A: Right. Q: And no one had given any inconsistent answers so far as you knew to any questions, right? A: No. Q: So then you conferred with Officer Larsen a while back by your vehicle, I believe, right? A: Yes. Q: And you talked—or he mentioned to you this officer safety warning? A: Yes.), 30 (Q [by defense counsel]: And at that time [immediately after stopping the vehicle] you didn't make any determination, did you, that there was any concern for your safety as you were walking around the vehicle? A [Hawley]: No), 34 (Q [by defense counsel]: How long had you been with these three people, either alone or with Officer Larsen, when you first decided that these individuals, one or all of them, posed some kind of a possible safety risk to you or Officer Larsen? How long had you been with them? A [Hawley]: Probably about five minutes. Q: Is it possible it could have been longer than that? A: Not much longer. Q: So you pulled them over, you searched the vehicle, you didn't find anything, and then after that you determined that the appropriate thing to do for your safety would be to pat these people down, is that right? A: I hadn't completed the search of the vehicle, but, yes. * * * A: But you—you commenced your search of this vehicle even before Officer Larsen arrived to provide back up for you, didn't you? A: Yes. Q: And you could have delayed your search if safety was of a concern to you until another officer arrived, isn't that correct? A: Yes.), p. 34 (Q [by defense counsel]: * * * [W]hy didn't it dawn on you right away when you saw [Walker] that might be some kind of safety risk? Why did you make that determination several minutes later? A [Hawley]: I had forgotten about the safety warning, and I was reminded of it.), 42 (Q [by AUSA]: Okay. And did you convey this information [the officer safety warning] to Officer Hawley? A [Larsen]: Yes. I asked him if he remembered or not, and he suddenly did. Q: What did you do then? A: Mr. Hawley approached Mr. Walker, and had told him that we had received some information he might possibly be carrying a semi-automatic pistol, and wanted to pat him down for officer safety), 44 (Q [by AUSA]: Was the firearm [taken from Walker] checked to see if it was loaded? A [Larsen]: I didn't. I didn't even pay attention if he did at that point. He secured the weapon. Q: What did you do then? A: I approached Mr. Menard. Q: And what happened? A: I asked him if he had any weapons on him also. Q: What did he say? A: No. Q: And what did you

say then? A: I told him I was going to pat him down for our safety anyway. Q: What did he say then? A: And then he said, yes, I do. I have a .410.), 49 (Q [by defense counsel]: And so even though you are standing back there and may have known who they were, you did not search Mike Walker immediately, did you? A [Larsen]: No, sir, I did not.), 50 (Q [by defense counsel]: Up to this point—up to that point [at which officers told Walker they were going to pat him down], had anyone made any furtive movements, any suspicious gestures, that gave you cause to fear for your safety? A [Larsen]: They looked nervous. Q: People look nervous frequently when they are pulled over by the police, don't they? A: Yes. Q: That is not cause for undue suspicion, is it? A: Not really.), 53–55 (Q [by defense counsel]: And where—when you first arrived, where was Officer Hawley at, if you remember? A [Larsen]: He was on the driver's side. The door was open. Looked like he was searching the driver's side compartment. Q: Didn't look like he appeared to be too concerned about what these three individuals were doing outside their car, did he? A: I can't say if he was or not. * * * Q: And apparently because he was involved in searching the vehicle when you arrived, he apparently, based on what you observed, was not too concerned about what these people were doing outside the car, is that right? A: I'm sure he was watching them. * * * Q: Well, there wasn't any—now, there wasn't any sense of urgency, was there, in getting the vehicle searched? A: No. Q: I mean would you agree with me, Officer, that the greatest threat to an officer's safety when you pull somebody over is not necessarily what is in the car, but what might be on the persons that were in the car? Would you agree with that? A: I am concerned about everything myself, but I can't say that Officer Hawley—Q: And then you say you approached these three people, as I understand it * * *), 56–58 (Q [by defense counsel]: And there was nothing found in the vehicle by way of contraband, weapons, drugs, notes, cash or anything like that that gave you reason to believe that any of these individuals had just committed a crime, is that right? A [Larsen]: There was a knife in the vehicle. Q: Okay. But I think you told the Court that you didn't believe that was illegal, is that right? A: No, it wasn't. But there was a weapon in there. Q: Nobody got charged with that knife, did they? A: No, sir. * * * Q: [I]t was shortly after the search of the vehicle was completed, as I understand it, that Officer Hawley patted down Mr. Walker, is that right? A: After I had spoke [sic] with him by the vehicle, yes. Q: And up to that point, as I understand your testimony, response to questions from both counsel, you, sir, had no reason to believe that any of these individuals was going to harm you or Officer Hawley in any way? You had no reason to believe that, based on what you had observed up to that point, is that right? A: Up until I spoke with Mr. Hawley, I had no idea if he had already patted them down or got a consent for them, too. I had no idea if he had

Menard's companionship with Walker is *one* of the circumstances in the totality of the circumstances upon which the reasonableness of the search of Menard may be determined. *Flett,* 806 F.2d at 827. Although the standards stated in *Jones,* 990 F.2d at 406, and *Wantland,* 754 F.2d at 270, could be read to allow the court to rely on objective facts not subjectively relied upon by the searching officers, the court believes that such a reading would drastically overextend *Terry.* However, the court, in an abundance of caution, will consider both whether all of the circumstances objectively present give rise to a reasonable suspicion, as well as whether the facts actually, subjectively relied upon by the officers, gave rise to a reasonable suspicion that the officers should perform a protective pat-down of Menard.

Looking first only at the facts actually relied upon by the officers as creating a reasonable suspicion to search Menard,[7] the court finds the question of the constitutionality under the Fourth Amendment of the pat-down search of Menard to be an extraordinarily close one. The court nonetheless concludes that there is more than "mere propinquity," even in the facts actually relied upon by the officers, justifying the pat-down search of Menard. *Cf. Ybarra,* 444 U.S. at 100, 100 S.Ct. at 347.

There must be "propinquity plus more." *Id.* The "more" here is Menard's association with Walker, which, although not based on similarity of attire, *Flett,* 806 F.2d at 827–28, was apparent from their travel together, *Tehrani,* 49 F.3d at 59 (travel together suggests association in same activity), in the same vehicle, making it unlikely that Menard was merely an "innocent visitor." *Vizcarra–Martinez,* 57 F.3d at 1511 (circumstances must suggest that companion is more than "innocent visitor"); *Reid,* 997 F.2d at 1578

(greater likelihood of involvement if companion is in small private place, rather than in public); *Holder,* 990 F.2d at 1329 (same); *McKie,* 951 F.2d at 402 (persons travelling together in a car are more likely there by invitation or consent, citing *Vaughan,* 718 F.2d at 335 n. 6). More importantly, the finding of a weapon on Walker suggested that this was indeed a situation in which an officer would be warranted in the belief that his safety might be in danger and precautions should be taken. *Douglas,* 964 F.2d at 741. Furthermore, the pat-down search of Menard, once the weapon was found on Walker, was the least intrusive method to determine rapidly whether any further weapons were in the hands of anyone else involved in the stop so that the purposes of the stop might be achieved. *Hensley,* 469 U.S. at 235, 105 S.Ct. at 683; *Brown,* 51 F.3d at 132–33; *McMurray,* 34 F.3d at 1411; *Watts,* 7 F.3d at 125; *Raino,* 980 F.2d at 1149; *Knox,* 950 F.2d at 519.

The objective, articulable facts present here weigh slightly more decisively in favor of upholding the pat-down of Menard as constitutional if the test is truly an objective one, and the court need only be concerned with whether the totality of the circumstances, as found from the record, would have "warrant[ed] [an officer] of reasonable caution in the belief" that a weapons pat down was appropriate, *Wantland,* 754 F.2d at 270, whether or not these officers actually relied upon those facts. These additional circumstances, objectively apparent, include the time and location of the pat-down searches, the lack of other people in the area, and the relative numbers of passengers in the vehicle to police present on the scene. At the time officers conducted a pat-down search of Menard, they were alone with three

---

already done that. Q: Would that be your normal procedure at your department, to search the vehicle first, then worry about patting people down later? Would that be the normal procedure? A: I usually like to pat them down first, but I can't say what Officer Hawley does. Q: That wasn't done in this case, was it? A: Not—no.). The officers' apparent lack of a deep concern about their safety, even after the weapon was found on Walker, is suggested by the fact

that no officer ever performed a pat-down search of the third occupant of the stopped vehicle, Lisa Jensen.

7. These are the facts that would determine the officers' *subjective* belief that their search was reasonable. *Jones,* 990 F.2d at 406–07. However, they are also the facts known to the officers, and the question, applying an objective standard, would be whether a reasonable officer knowing these facts would believe a search was reasonable. *Terry,* 392 U.S. at 21–22, 88 S.Ct. at 1880.

people, one of whom was known to be armed, along a highway in the middle of the night. *Douglas,* 964 F.2d at 741; *Tharpe,* 536 F.2d at 1100. Menard's association with Walker was apparent from their travel together, *Tehrani,* 49 F.3d at 59 (travel together suggests association in same activity), at that hour of the night in the same vehicle, making it unlikely that Menard was merely an "innocent visitor." *Vizcarra–Martinez,* 57 F.3d at 1511 (circumstances must suggest that companion is more than "innocent visitor"); *Reid,* 997 F.2d at 1578 (greater likelihood of involvement if companion is in small private place, rather than in public); *Holder,* 990 F.2d at 1329 (same); *McKie,* 951 F.2d at 402 (persons travelling together in a car are more likely there by invitation or consent, citing *Vaughan,* 718 F.2d at 335 n. 6). In these circumstances, a decision to search Menard for weapons was reasonable to dispel any suspicion that Menard might also be a threat to the officers' safety. *Flett,* 806 F.2d at 828 (test is whether a reasonably prudent person would be warranted in the belief that his safety was in danger, citing *Terry,* 392 U.S. at 27, 88 S.Ct. at 1883); *see also Whitfield,* 907 F.2d at 799. These additional circumstances, objectively apparent, further support a conclusion that this was indeed a situation in which an officer would be warranted in the belief that his safety might be in danger and precautions should be taken. *Douglas,* 964 F.2d at 741. Again, the patdown search of Menard, once the weapon was found on Walker, was the least intrusive method to determine rapidly whether any further weapons were in the hands of anyone else involved in the stop so that the purposes of the stop might be achieved. *Hensley,* 469 U.S. at 235, 105 S.Ct. at 683; *Brown,* 51 F.3d at 132–33; *McMurray,* 34 F.3d at 1411; *Watts,* 7 F.3d at 125; *Raino,* 980 F.2d at 1149; *Knox,* 950 F.2d at 519.

The court is not here applying a rule similar to that rejected by the District of Columbia Circuit Court of Appeals in *Reid,* 997 F.2d at 1578 (rejecting a general rule that police officers executing a warrant to search for drugs should be able to search everyone on the premises for weapons), which would automatically permit a search of everyone at the scene of an investigatory stop. The court finds that the officers did not under-take to search anyone present at the scene until they recalled the weapons warning concerning Walker. Only when fears arising from that warning were confirmed, because Walker was found to be armed, did they extend their search to other persons present. Nor does the court believe that the fears expressed by the district court in *Meadows,* 885 F.Supp. at 3, that officers will piggyback frisks without an articulable, independent basis, onto an illegal search that reveals a weapon, arise here. In *Meadows,* the court was concerned that officers would simply search each person present in turn, recognizing that the first weapon recovered would not be lawfully seized, but that all subsequent searches would be constitutionally valid because of the finding of the weapon establishing reasonable suspicion for the remaining searches. *Id.* In the present case, the court has already found the initial search that revealed a weapon, the search of Walker, to be constitutionally valid. The search of Walker was based on an independent basis, the officer warning, and was not simply an on-the-scene search without any other basis. *Cf. Meadows,* 885 F.Supp. at 3.

The search of Menard here, either viewing all of the circumstances present or only those actually relied upon by the searching officers, presents a situation in which the search was based on "propinquity plus more," although there is just barely "more," giving rise to a reasonable suspicion that the officers might be in danger from armed and dangerous persons. Menard's motion to suppress must also be denied.

## IV. CONCLUSION

The only question involved in these motions to suppress that the court does not find to be a close one is the question of the validity of the initial vehicle stop. Decisions of this circuit's court of appeals and of the Supreme Court make it abundantly clear that officers may stop a vehicle for even the most minor traffic violation and there is nothing in the record here to suggest that this vehicle stop was not based on such an actual violation. The remaining questions involved, however, are nowhere near as easily resolved.

The question presented by Walker's motion to suppress is whether there was any reasonable, articulable suspicion that Walker posed a safety risk to the officers. The court concludes that the officer safety warning that Walker might be armed and dangerous is sufficient to justify the minimally intrusive pat-down search for weapons, although the court does not find the question free from all doubt.

■ The question presented by Menard's motion to suppress, however, is different, and very close indeed. That question is, what besides "mere propinquity" formed the basis for the search of Menard? The court concludes that, considering only those facts actually relied upon by the officers, there is "propinquity plus more," although just barely, in Menard's presence with another person discovered to be armed, in the close association reasonably to be inferred from travel together in a private vehicle, creating the minimum circumstances upon which a reasonable suspicion that the companion may also be armed can be based. Considering the totality of the circumstances and a reasonable officer's response to those circumstances, instead of only those facts upon which the officers actually relied, there are also the location, alone beside a highway, the timing, late at night, and the likelihood that persons travelling together at that time of night in a single vehicle are associated in some common endeavor, as additional facts to add to the "propinquity plus more" equation. Furthermore, the officers' response to that situation, a prompt, minimally intrusive pat-down search, was a reasonable response to a reasonably perceived danger to the officers. This totality of circumstances, the court concludes, is sufficient to make the seizure of the weapon from Menard constitutionally valid. Both motions to suppress are therefore denied.

**IT IS SO ORDERED.**