**UNITED STATES of America, Plaintiff,**

v.

**Michael Bernard MORRIS, Defendant.**

**No. CR 95–3004.**

United States District Court,
N.D. Iowa,
Central Division.

Dec. 11, 1995.

Janet Papenthein, Assistant United States Attorney, Sioux City, Iowa, for the U.S.

Alfredo Parrish of Parrish, Kruidenier, Moss, Dunn & Montgomery, Des Moines, Iowa, for Defendant Michael Bernard Morris.

### MEMORANDUM OPINION AND ORDER REGARDING DEFENDANT'S MOTION TO SUPPRESS

### TABLE OF CONTENTS

I. INTRODUCTION AND BACKGROUND ................................... 1432
II. FINDINGS OF FACT ........................................... 1433
III. LEGAL ANALYSIS .......................................... 1439
 A. Unreasonable Delay ........................................ 1440
 1. Delay prior to issuance of citations ............................ 1440
 2. Delay after issuance of Mr. Morris's citation ................... 1443
 B. Reasonable Suspicion For Further Search .......................... 1444
 C. Consent ............................................... 1446
 1. The voluntariness of Mr. Morris's consent .................... 1446
 a. Circumstances in which consent was obtained ............... 1447
 b. Characteristics and conduct of the consenting person ........... 1448
 2. Was the consent "tainted"? .............................. 1449
 3. Scope of the consent ................................... 1449
IV. CONCLUSION ............................................. 1450

BENNETT, District Judge.

This motion to suppress requires the court to test for unconstitutional taint before, at the time of, and following the defendant's consent to the search of a vehicle he was driving. In the process, the court must examine the interplay between the defendant's consent to the search and circumstances that would otherwise make the search and seizure in this case unreasonable. An improper pass of another motor vehicle caused a trooper with the Iowa State Patrol to stop the defendant's vehicle and that stop eventually led to the seizure of weapons from the trunk of the defendant's vehicle, followed by charges against the defendant for being a felon in possession of firearms. The defendant has moved to suppress evidence resulting from the search of his vehicle principally on the ground that an unreasonable delay between the stop and the search for weapons tainted the circumstances under which any evidence was eventually obtained, including his consent to the search, thereby violating the Fourth Amendment prohibition on unreasonable searches and seizures.

### I. INTRODUCTION AND BACKGROUND

On February 21, 1995, a three-count indictment was returned against defendant Mi-

chael Bernard Morris as the result of a traffic stop of the automobile Mr. Morris was driving on October 21, 1994, and the discovery in that vehicle of a shotgun, handgun, and ammunition. The indictment charged Mr. Morris with (1) being a felon in possession of a firearm in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2); (2) being a felon in possession of firearm ammunition in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2); and (3) criminal forfeiture of the firearms pursuant to 18 U.S.C. § 922(d).

On October 12, 1995, Mr. Morris filed a motion to suppress evidence discovered as the result of a warrantless search of his vehicle following the traffic stop on October 21, 1994. The gravamen of Mr. Morris's motion as filed was that his continued detention and the search of his vehicle after a traffic citation had been issued was not supported by reasonable suspicion, and therefore violated the Fourth Amendment to the United States Constitution. Mr. Morris seeks to suppress evidence garnered from the assertedly unconstitutional search, including the weapons themselves and any statements he made to law enforcement officers after the search of his vehicle. The United States resisted the motion to suppress on October 24, 1995.

The court held an evidentiary hearing and arguments on the motion to suppress on November 9, 1995. The United States was represented by Janet Papenthein, Assistant United States Attorney, of the United States Attorney's Office in Sioux City, Iowa. Defendant Michael Bernard Morris was represented by Alfredo Parrish of Parrish, Kruidenier, Moss, Dunn & Montgomery, in Des Moines, Iowa. At the hearing, the United States presented the testimony of Iowa State Patrol Trooper Kelly Hindman. Mr. Morris offered no witnesses or other evidence.

The oral arguments following submission of testimony did much to clarify the issues presented by Mr. Morris's motion to suppress. Mr. Morris seeks to suppress the evidence in question on three grounds: that he had been detained for an unreasonably long time before the search in which the weapons were found was initiated; that the reinitiation of a search of his vehicle after he had been issued a citation was not supported by a reasonable suspicion of criminal activity;

and that any consent he may have given for the search revealing the weapons was tainted by the unreasonably long detention.

During the course of oral arguments, the United States requested leave to file a brief in resistance to the motion to suppress in light of the evidence and arguments presented during the hearing. The court granted the United States leave to file a brief in resistance to the motion not later than November 20, 1995, and the government's brief was filed on that date. Mr. Morris was granted until November 27, 1995, to file a response to the brief of the United States. Mr. Morris orally sought an extension of his deadline to file a response brief, and eventually filed a written motion requesting until December 1, 1995, to file his response brief. That motion for extension was granted and Mr. Morris filed his response brief on December 1, 1995. This matter is now fully submitted, and the court may turn to the facts upon which disposition of the motion to suppress depends.

## II. FINDINGS OF FACT

The court makes these findings of fact for the purposes of this motion to suppress only. On October 21, 1994, upon logging back into service on his car radio after attending a court hearing in Webster City, Iowa State Patrol Trooper Kelly Hindman received a report from state radio in Cedar Falls that a truck driver travelling with another truck southbound on a nearby county road, P–59, had used his cellular telephone to report that the two trucks had been passed on the right, that is, on the shoulder, by two automobiles. Trooper Hindman got on U.S. Highway 20, which is a four-lane highway, and headed westbound hoping to intercept the trucks and cars. Through dispatch radio, Trooper Hindman learned that the truck drivers were willing to stop and file charges against the drivers of the automobiles that had passed them improperly, and he also learned that the four vehicles in question were now eastbound on Highway 20 coming toward him. The truck driver identified the vehicles that had improperly passed the two trucks as a black Lincoln Town Car followed by a grey Cadillac and he provided a license plate num-

ber for the Cadillac, the second of the two automobiles, as Iowa number UVA 181.

Trooper Hindman met the four vehicles in Webster County, about halfway between Fort Dodge and Webster City. After cutting through the center median and heading back eastbound, Trooper Hindman passed the semi-trailer trucks and motioned to the two cars to pull over. All five of the vehicles involved, including Trooper Hindman's, moved to the shoulder of the road and stopped, with Trooper Hindman's vehicle between the two automobiles and the two semi-trailer trucks, or third in line. According to Trooper Hindman's report, this stop occurred at 10:29 a.m. The vehicles stopped on the eastbound side of Highway 20 in Webster County about three or four miles from the town of Duncombe, roughly mid-way between Fort Dodge and Webster City and approximately ten or twelve miles from each of those cities. The area where the stop took place was an open, public location next to a divided, four-lane highway that, according to Trooper Hindman's testimony, "looks all the world like an interstate, except in that area there aren't on ramps and off ramps."

Upon stopping, Trooper Hindman observed that in the front vehicle, the Lincoln, the driver, a male, and the passenger, a female, were attempting to change places. Trooper Hindman radioed this information to Cedar Falls and requested a backup car. He was advised that Trooper Tim Van Engen and a training officer, Trooper Rob Mordini, were already en route to Trooper Hindman's location. Trooper Hindman then left his vehicle and asked the driver of the Cadillac to roll down his window. Trooper Hindman told the driver and passenger of the Cadillac he would need some identification and then told the occupants of the Lincoln the same thing. The Lincoln was driven by Mario Wright and his passenger was a Ginger or a Gayle Anderson. The driver of the Cadillac was defendant Michael Morris, a 19–year–old black male, and his passenger was Donna Crandall. Trooper Hindman told all of the occupants of the vehicles to stay in their cars and advised each of the drivers separately that the truck drivers had made complaints of improper passing and that their complaints were the reason he had stopped the two cars.

During this conversation with Mr. Morris, Trooper Hindman observed a small baseball bat, about eighteen inches long, stuck between the front seats of the Cadillac and a can of mace on the console. Trooper Hindman asked Mr. Morris to hand these items out of the car window and placed them on top of the Cadillac. Trooper Hindman testified that he had taken this precaution for his own safety. He then asked Mr. Morris if there were any other weapons, drugs, or contraband in the vehicle, and Mr. Morris answered that he thought there was a shotgun in the trunk. Trooper Hindman confirmed that Mr. Morris had said there was a shotgun in the trunk, but did not at that time ask to search the trunk. Instead, he took oral statements from the truck drivers before returning to his vehicle to radio in the identification information he had obtained from each of the occupants of the vehicles. The other two troopers arrived while Trooper Hindman was talking to Mr. Morris, and took a position in line with the other vehicles. Trooper Hindman advised them of the possible shotgun in the trunk of the Cadillac before returning to his own vehicle to run a radio check on identification.

Although Trooper Hindman took initial oral statements from each of the truck drivers to prepare the improper passing citations, the written statements were taken by other troopers then present. Although Trooper Hindman could not state at what time the truck drivers left the scene, it was after their written statements were taken and Trooper Hindman had read those statements. The truck drivers' statements indicate that they were taken at 10:44 a.m. and 10:46 a.m.

The radio check on identification was a routine procedure to check the validity of driver's licenses and to see if there were any outstanding warrants or other sorts of paperwork that needed to be served on the persons stopped. In addition to the two improper passes for which he had been stopped, Trooper Hindman found that Mr. Wright, the driver of the Lincoln, had an expired license. He therefore began to prepare two citations for improper passing and one for an expired license for Mr. Wright. The radio check

revealed that Mr. Wright's passenger, Ms. Anderson, had an unserved license suspension notice from the Iowa Department of Transportation and Trooper Hindman generated the paperwork to serve that notice. An improper passing citation also had to be prepared for Mr. Morris. Ms. Crandall, Mr. Morris's passenger, had two outstanding arrest warrants, one for Story County and the other for Buena Vista County. Trooper Hindman began the process to verify these outstanding warrants by radio and teletype between Cedar Falls radio and Story County and Buena Vista County. The current validity of each warrant was confirmed, so Trooper Hindman began the process by radio to determine whether officers from either county would come to pick up Ms. Crandall from her present location or if they would meet Trooper Hindman somewhere to pick her up in the event she could not post the scheduled bond. Story County officers indicated they would come pick up Ms. Crandall if she could not post the scheduled bond, but Buena Vista County officers stated they would not travel so far to collect her.

The warrants for Ms. Crandall were entered on a statewide system, but each was described as a "countywide" warrant. The "countywide" limitation indicates that the issuing county will only attempt to pick up the wanted person if he or she was found inside the issuing county and that generally county officers will not be willing to travel out-of-county to collect the person named in the warrant if that person was stopped by other law enforcement officials outside of the issuing jurisdiction. However, county officers usually will travel as far as their own county line to make a pickup.

Trooper Hindman testified that on ten or twelve occasions, he had transported people wanted on "countywide" warrants to the issuing county or its borders and that on none of those occasions had the officials of the issuing county specifically requested that he do so. Trooper Hindman estimated that he was about seventy-five miles from the Buena Vista County line at the place where the stop in this case occurred, and that he had on five or six occasions transported people that far for pickup on "countywide" warrants. Trooper Hindman could not offer specifics on any of the occasions on which he had transported

anyone anywhere on a "countywide" warrant to facilitate the collection of that person by officers of the issuing county. Buena Vista County was itself outside of Trooper Hindman's assigned district, but the bordering county of Pocahontas was within his assigned district. Trooper Hindman testified that he did not believe he had ever left his assigned district to complete the handover of a person wanted on a "countywide" warrant, but the court finds that he would not have had to do so in this case, because he could meet Buena Vista County officers at the county line without leaving his own district. Trooper Hindman did not have to obtain any permission from a supervisor or otherwise follow any procedures in order to leave his assigned district to deliver a person wanted on a "countywide" warrant to the issuing county.

After receiving the report of the two "countywide" warrants for Ms. Crandall, Trooper Hindman asked Ms. Crandall in a conversation in his patrol car if she could post the bond for either or both counties. She stated that Mr. Morris would pay her bonds. Trooper Hindman then discussed with Mr. Morris, who was still seated in his own vehicle, whether he would be willing to post Ms. Crandall's bonds. Mr. Morris gave Trooper Hindman money for the bond for Story County, but initially refused to pay the bond for Buena Vista County, because officers from that county had indicated they were unwilling to come get Ms. Crandall. Trooper Hindman then told Mr. Morris that he "wasn't going to stand on the road and play a bunch of games" and that he had statewide jurisdiction, so he would transport Ms. Crandall to the border of Buena Vista County to be picked up if she couldn't post her bond. Mr. Morris then gave Trooper Hindman the money to post Ms. Crandall's bond for Buena Vista County as well. At this time, Mr. Morris had never left his vehicle, but Ms. Crandall was in Trooper Hindman's patrol car. After his discussion with Mr. Morris, Trooper Hindman returned to his vehicle where he and Ms. Crandall completed the paperwork necessary when a bond is posted on a roadside stop. This process included completing bond payment paperwork, verifying the amount of the bond

money, placing it in envelopes and addressing it to the proper jurisdictions.

Besides Ms. Crandall's bond payment paperwork, additional paperwork had to be completed during the course of the traffic stop. This paperwork included the two citations for improper passing and one for an expired license for Mr. Wright, and an improper passing citation for Mr. Morris. Trooper Hindman filled out the citation for Mr. Morris, but he testified that Trooper Van Engen filled out some of the other citations. It normally takes Trooper Hindman about ten to fifteen minutes to fill out a citation. Also, paperwork to serve Ms. Anderson with the notice of suspension of her driver's license had to be generated. In addition to this considerable amount of paperwork that had to be completed, there were extensive radio communications, and consequent delays awaiting responses, that had to be conducted to process all of the matters resulting from the stop.

After completing Ms. Crandall's bond paperwork, Ms. Anderson's license suspension notice, the three citations for Mr. Wright, and the one citation for Mr. Morris, Trooper Hindman delivered these documents to each of the people involved and returned their identification documents. All paperwork pertaining to Mr. Morris was done and there was no other legal reason at that point to detain Mr. Morris. Therefore, Mr. Morris was free to go, but Trooper Hindman did not specifically tell Mr. Morris that. Trooper Hindman returned Mr. Morris's identification and gave him his citation at approximately 11:45 a.m., approximately one-and-one-quarter hours after the initial stop. Trooper Hindman then returned Mr. Wright's identification and gave him his citations, at which time he asked Mr. Wright if he could search Mr. Wright's vehicle. Mr. Wright consented, and Trooper Hindman and Trooper Van Engen made a search of the Lincoln, which revealed nothing.

Trooper Hindman then returned to Mr. Morris's vehicle, where Mr. Morris was still waiting. Although Trooper Hindman had no safety concerns at that time, and was not aware of any reason to believe any weapon in the trunk of Mr. Morris's car was stolen, he asked Mr. Morris to confirm that he had told him earlier there was a shotgun in the trunk of the vehicle. Trooper Hindman testified that he was "curious" about the shotgun, in part because he had found the baseball bat and the mace, and he "felt like it was part of my duties to investigate further as to the shotgun, whether it was stolen or whether it wasn't." He also testified that he had not seen any other items inside the vehicle that gave rise to safety or other concerns, apart from the baseball bat and can of mace, which he had already removed.

Therefore, at some time after 11:45 a.m., the time at which Trooper Hindman gave Mr. Morris his identification and his citation, and after searching Mr. Wright's vehicle, Trooper Hindman returned to Mr. Morris's vehicle to confirm what Mr. Morris had told him earlier about a shotgun in the trunk. At this time, Trooper Hindman also asked Mr. Morris if there were any drugs, weapons, or other contraband in the car that he should be aware of. Mr. Morris answered that, in addition to the shotgun, he thought there might also be a handgun in the trunk of his car. Trooper Hindman asked Mr. Morris if he could search his car and check out those weapons, to which Mr. Morris replied, "Sure, fine," or words to that effect. Trooper Hindman did not advise Mr. Morris that he did not have to consent to the search and did not ask Mr. Morris to complete a consent to search form, although Trooper Hindman had previously been given such forms to obtain consents to searches. Trooper Hindman is not sure whether he had any such forms with him in his patrol car at the time of this search.

After Trooper Hindman asked if he could search Mr. Morris's car, and Mr. Morris had consented to the search, without being asked to do so, Mr. Morris exited his vehicle and opened its trunk. The vehicle had a rear-mounted spare tire with a decorative cover that had to be laid back before the trunk could be opened. Mr. Morris removed the spare tire cover and opened the trunk himself, then moved back. Inside the trunk, Trooper Hindman found a hard plastic gun case which he removed to the shoulder of the road behind the vehicle and opened. Inside he found a 20-gauge shotgun, subsequently determined to be a Winchester 1300 Featherweight, with a pistol grip rather than a stan-

dard stock, a .22 caliber handgun that looked like a derringer, and ammunition. Neither weapon was loaded.

Trooper Hindman took down the serial numbers for both weapons and called them in to state radio in Cedar Falls to determine if either had been reported stolen. The weapons check is actually made from a database in Iowa City, but the database is accessible through state radio in Cedar Falls. The response to the weapons check on the shotgun indicated that it had been reported as stolen to police in Fort Dodge on or about September 9, 1994, about six weeks prior to the traffic stop in question here. No report was available on the handgun.

Trooper Hindman "wasn't comfortable just taking the information from radio that [the shotgun] was stolen," so he decided to check the report directly with the Fort Dodge Police Department. He called the Webster County Law Enforcement Center in Fort Dodge and asked the dispatcher to have a city officer confirm from the burglary report that the weapon stolen matched the serial number and description of the weapon he had found in Mr. Morris's trunk. A Fort Dodge police officer confirmed the serial number and description of the stolen weapon. Trooper Hindman then left his vehicle, and returned to Mr. Morris, who was standing on the roadside with two troopers and Ms. Crandall, and arrested Mr. Morris for forth degree theft for possession of stolen property. Trooper Hindman was unable to estimate at what time he arrested Mr. Morris, but the court finds that it was certainly more than one hour-and-a-quarter hours after the initial stop took place.

After Mr. Morris was arrested, Trooper Van Engen began an inventory search of Mr. Morris's vehicle, Trooper Hindman secured the shotgun in the backseat of his patrol car, and Sergeant Moler, another State Patrol Officer who had arrived in the interim, took custody of the derringer handgun. At approximately 12:45 p.m., or a few minutes before that, Trooper Hindman left the scene of the stop and began transporting Mr. Morris to Fort Dodge in the front seat of his patrol car. At some point, Sergeant Moler transported Ms. Crandall to Duncombe, the nearest town, about three or four miles away, so that he could witness Ms. Crandall's mailing of her bond payments. However, the court concludes from other testimony that Ms. Crandall was present at the time Mr. Morris was arrested.

During the trip to Fort Dodge, Trooper Hindman read Mr. Morris his *Miranda* rights. Also during the trip to Fort Dodge, Trooper Hindman asked state radio to run a "CCH," or criminal history check, on Mr. Morris. Mr. Morris asked what a CCH was, and when it was explained to him, asked why Trooper Hindman was asking for one. Trooper Hindman explained that if Mr. Morris happened to be a felon, then he might be charged with a more serious offense of being a felon in possession of a firearm, rather than just being in possession of a stolen firearm. Mr. Morris then told Trooper Hindman that he had a prior conviction for first degree theft. Trooper Hindman and Mr. Morris arrived at the Webster County Law Enforcement Center in Fort Dodge at about 1:00 p.m. or slightly before. The entire process, from the initial stop until Mr. Morris was delivered to the Webster County Law Enforcement Center, took approximately two-and-one-half hours. At the Law Enforcement Center, Mr. Morris was questioned by Trooper Hindman and Fort Dodge Police Detective Maki.

In order to understand how the stop and search of Mr. Morris's vehicle unfolded, the court supplies the following summary timeline of events, indicating events for which a time has been established in normal font, and all other events that occurred between known times in italics.

**1438**

| Time | Event |
|---|---|

—(10:15 a.m.)

— *Radio report of two cars improperly passing two trucks on County Road P-59.*

—(10:29 a.m.) —— Trooper Hindman stops Cadillac and Lincoln on Highway 20 midway between Fort Dodge and Webster City (12 miles from each). Two trucks also stop.
— *Trooper Hindman calls for backup.*
— *Trooper Hindman requests identification from occupants of both cars.*
— *Small bat and can of mace removed from Cadillac; Mr. Morris admits to presence of shotgun in trunk. Backup troopers arrive.*
— *Trooper Hindman takes oral statements from truck drivers; backup troopers take written statements.*
— *Trooper Hindman runs radio check on identification and begins to prepare citations.*

—(10:44–46 a.m.) —— Truck drivers' written reports are read and time-marked.

— *Radio check reveals two warrants for Ms. Crandall and suspension notice for Ms. Anderson. Trooper starts to generate paperwork to serve those.*

— *Radio and teletype check on validity of warrants and radio check on willingness of two counties to send officers to collect Ms. Crandall.*

—(11:00 a.m.)

— *Responses from counties indicate Story will come get Ms. Crandall, but Buena Vista will not.*
— *Discussion about bonds with Ms. Crandall in patrol car.*
— *Discussion with Mr. Morris about paying Ms. Crandall's bonds at Mr. Morris's vehicle.*
— *Mr. Morris pays bond money.*
— *Trooper Hindman returns to patrol car to complete bond paperwork with Ms. Crandall as well as other citations and notices.*

—(11:30 a.m.)

—(11:45 a.m.) —— Identification, four citations, suspension notice, and driver's licenses returned to occupants of cars.
— *Consent search of Mr. Wright's Lincoln.*

— *Confirmation of shotgun in trunk, and Mr. Morris adds there may be a handgun, too.*
— *Request to search Mr. Morris's Cadillac.*
— *Mr. Morris consents, and leaves vehicle for the first time to open trunk.*

—(12:00 p.m.)

— *Gun case is discovered and opened revealing shotgun and handgun.*
— *Serial numbers are written down and Trooper Hindman begins radio check on those numbers.*

| Time | Event |
|------|-------|

— *Radio check of Iowa City database via Cedar Falls state radio reveals shotgun has been reported stolen in Fort Dodge report.*
— *Trooper Hindman verifies stolen weapon report directly with Fort Dodge police.*

—(12:30 p.m.)

— *Fort Dodge officer checks burglary report and verifies serial number and description of shotgun.*
— *Mr. Morris is arrested for possession of a stolen weapon.*
— *Trooper Van Engen begins inventory search of Mr. Morris's vehicle.*

—(12:45 p.m.) —— Trooper Hindman transports Mr. Morris to Fort Dodge.
— *During the trip Trooper Hindman reads Mr. Morris his Miranda rights.*

— *Trooper Hindman checks Mr. Morris's criminal history.*
—(1:00 p.m.) —— Mr. Morris arrives at Webster County Law Enforcement Center in Fort Dodge where he is questioned by Trooper Hindman and Fort Dodge Police Detective Maki.

---

Trooper Hindman had a good deal of contact with Mr. Morris during the course of the stop. Mr. Morris was nineteen years old at the time of his arrest, is of average intelligence, understood the allegations that had been made against him concerning the improper pass of the trucks, understood everything said through all of the discussions, gave appropriate responses at all times, and there is no evidence that he was under the influence of drugs or alcohol. Although the stop undoubtedly was a long one, it was lengthened by the number of items concerning each of the occupants of the stopped vehicles that had to be processed and the amount of radio traffic necessary to complete that business, as well as the amount of paperwork that had to be generated. Trooper Hindman considered the stop to be "an extremely complicated" one, and the court agrees, owing to the number of things that had to be done. In an attempt to limit confusion, Trooper Hindman tried to complete as much of the paperwork as possible himself, although other officers took the truck drivers' statements and completed some of the citations issued.

## III. LEGAL ANALYSIS
### (including some ultimate findings of fact)

■ As the court observed above, Mr. Morris now seeks to suppress all evidence obtained by law enforcement officers after he was issued a citation for improper passing, including the weapons seized from the trunk of his vehicle and any statements he may thereafter have made to law enforcement officers, on three grounds. First, he contends that he had been detained for an unreasonably long time before the search in which the weapons were found was initiated. Second, Mr. Morris argues that the reinitiation of a search of his vehicle after he had been issued a citation was not supported by a reasonable suspicion of criminal activity. Finally, he contends that any consent he may have given for the search revealing the weapons was tainted by the unreasonably long detention prior to Trooper Hindman's request for a consensual search of his vehicle. The court will consider each of these grounds for suppression *seriatim.* The court's findings of fact related to the stop, search, and seizure are reviewed for clear error, but the

court's ultimate determination of whether or not there has been a violation of the Fourth Amendment as the result of the factual circumstances is reviewed *de novo.* *United States v. Pereira–Munoz,* 59 F.3d 788, 791 (8th Cir.1995); *United States v. White,* 42 F.3d 457, 460 (8th Cir.1994); *United States v. Bloomfield,* 40 F.3d 910, 918 (8th Cir.1994) (en banc), *cert. denied,* —— U.S. ——, 115 S.Ct. 1970, 131 L.Ed.2d 859 (1995).

### A. Unreasonable Delay

■ There is no contention in this case that the initial stop of Mr. Morris's vehicle was not lawful.[1] Mr. Morris's first contention is that the period of the traffic stop was excessive, constituting an illegal detention, prior to the initiation of the search that revealed the weapons.

■ Both statements and physical evidence that result from an illegal detention are inadmissible. *United States v. Ramos,* 42 F.3d 1160, 1164 (8th Cir.1994) (citing *Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963)), *cert. denied,* —— U.S. ——, 115 S.Ct. 2015, 131 L.Ed.2d 1013 (1995). In light of the lawfulness of the initial stop, the first question posed by Mr. Morris's extended detention prior to the search of the trunk of his car is whether the detention was "reasonably related in scope to the circumstances which justi-

fied the interference in the first place." *Terry v. Ohio,* 392 U.S. 1, 20, 88 S.Ct. 1868, 1879, 20 L.Ed.2d 889 (1968). The Eighth Circuit Court of Appeals expressly applies this *Terry* standard for the reasonableness of a detention to a detention following a probable cause stop for a traffic violation as well as to a so-called "*Terry* stop," which is based instead on a reasonable suspicion of criminal activity. *See United States v. Barahona,* 990 F.2d 412, 416 (8th Cir.1993) (applying *Terry* standards for reasonableness of detention following lawful stop to probable cause stop for traffic violation); *United States v. Cummins,* 920 F.2d 498, 502 (8th Cir.1990) (same), *cert. denied,* 502 U.S. 962, 112 S.Ct. 428, 116 L.Ed.2d 448 (1991).

### 1. Delay prior to issuance of citations

■ There is "no rigid time limitation on *Terry* stops." *United States v. Sharpe,* 470 U.S. 675, 685, 105 S.Ct. 1568, 1575, 84 L.Ed.2d 605 (1985). Rather, the Eighth Circuit Court of Appeals has held that

> an investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop. Similarly, the investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time.

---

1. Mr. Morris does not contend that the initial stop of his vehicle was in violation of the Constitution, and, indeed, the court does not believe he could profitably do so in the circumstances here. A law enforcement officer may "stop and briefly detain a person for investigative purposes if the officer has a reasonable suspicion supported by articulable facts that criminal activity 'may be afoot.'" *Terry v. Ohio,* 392 U.S. 1, 30, 88 S.Ct. 1868, 1884, 20 L.Ed.2d 889 (1968); *United States v. Johnson,* 64 F.3d 1120, 1124 (8th Cir.1995) (quoting *Terry* ). However, this case does not involve a stop based on "reasonable suspicion," but one based on probable cause, because "[i]t is well established that a traffic violation—however minor—creates probable cause to stop the driver of a vehicle." *United States v. Barahona,* 990 F.2d 412, 416 (8th Cir.1993); *see also Pennsylvania v. Mimms,* 434 U.S. 106, 98 S.Ct. 330, 54 L.Ed.2d 331 (1977); *United States v. Hamby,* 59 F.3d 99, 101 (8th Cir.1995); *United States v. Johnson,* 58 F.3d 356, 357 (8th Cir.), *cert. denied,* —— U.S. ——, 116 S.Ct. 348, 133 L.Ed.2d

245 (1995); *United States v. Halls,* 40 F.3d 275, 276 (8th Cir.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 1721, 131 L.Ed.2d 579 (1995); *United States v. Bloomfield,* 40 F.3d 910, 915 (8th Cir. 1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 1970, 131 L.Ed.2d 859 (1995); *United States v. Garcia,* 23 F.3d 1331, 1334 (8th Cir.1994); *United States v. Cummins,* 920 F.2d 498, 500 (8th Cir.1990), *cert. denied,* 502 U.S. 962, 112 S.Ct. 428, 116 L.Ed.2d 448, 449 (1991); *United States v. Pillow,* 842 F.2d 1001 (8th Cir.1988). In this case, the reports of improper passing by the truck drivers, the identifying characteristics of the suspect vehicles the truck drivers were able to provide, the truck drivers' continued travel behind the suspect vehicles, and their assertion that they were willing to press charges, all provided probable cause for Trooper Hindman to stop Mr. Morris's and Mr. Wright's vehicles. Mr. Morris was issued a citation for an improper pass and does not contest the citation as improper in any way here. Thus, the court concludes that the initial stop was lawful in this case.

*United States v. Willis,* 967 F.2d 1220, 1224 (8th Cir.1992) (quoting *Florida v. Royer,* 460 U.S. 491, 500, 103 S.Ct. 1319, 1325–26, 75 L.Ed.2d 229 (1983)); *Bloomfield,* 40 F.3d at 916 (quoting *Willis* ). Therefore, in determining whether a detention following a lawful stop of a vehicle is reasonable, the Eighth Circuit Court of Appeals has held that the court must consider both the length of the detention and the efforts of the police to conduct their investigation quickly and unintrusively. *Bloomfield,* 40 F.3d at 916–17 (citing cases involving length of detention questions); *see also Sharpe,* 470 U.S. at 686–88, 105 S.Ct. at 1575–77 (detention of twenty minutes following stop was reasonable when the police acted diligently and defendant contributed to the delay); *United States v. Place,* 462 U.S. 696, 709–10, 103 S.Ct. 2637, 2645–46, 77 L.Ed.2d 110 (1983) (detention of ninety minutes was unreasonable when agents did not act diligently to minimize the delay).

 A detention following a vehicle stop does not exceed its reasonable scope while the law enforcement officer who made the stop makes an initial request for identification from the driver and any passengers, asks for an explanation of the presence of the occupants of the vehicle in the area, their destination and purpose, and runs a warrant check on the drivers licenses of all occupants of the vehicle, and a check on the registration of the vehicle to see if it is stolen or otherwise not in order. *United States v. Dawdy,* 46 F.3d 1427, 1430 (8th Cir.) (requests for identification of all occupants, explanation of presence in area, and warrant check are within reasonable scope of detention), *cert. denied,* —— U.S. ——, 116 S.Ct. 195, 133 L.Ed.2d 130 (1995); *United States v. White,* 42 F.3d 457, 459 (8th Cir.1994) (request for license, destination, and purpose within reasonable scope); *United States v. Ramos,* 42 F.3d 1160, 1163 (8th Cir.1994) (checks including license and vehicle registration are reasonable); *United States v. Barahona,* 990 F.2d 412, 416 (8th Cir.1993) (same); *United States v. Abokhai,* 829 F.2d 666, 671 (8th Cir.1987) (describing these actions as "minimally intrusive"), *cert. denied,* 485 U.S. 907, 108 S.Ct. 1082, 99 L.Ed.2d 241 (1988). Nor

is a delay resulting from an initial search for or removal of weapons unreasonable where these steps are reasonably necessary to protect the personal safety of the investigating officer and to maintain the status quo during the course of the investigative stop. *United States v. Watts,* 7 F.3d 122, 125 (8th Cir. 1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 895, 127 L.Ed.2d 88 (1994). Thus, there was nothing unreasonable about any delay while Trooper Hindman made these initial inquiries and checks and removed the small bat and can of mace.

 In the circumstances of this case, these reasonable activities led to further, time-consuming activities and inquiries. If during the course of the stop or as the result of the reasonable inquiries initiated by the officer, "the circumstances give rise to suspicions unrelated to the traffic offense, an officer may broaden [the officer's] inquiry and satisfy those suspicions." *United States v. Johnson,* 58 F.3d 356, 357–58 (8th Cir.1995); *Ramos,* 42 F.3d at 1163 (inconsistent answers by occupants or problems with the occupants' licenses or registration of the vehicle provide grounds for broadening the inquiry); *White,* 42 F.3d at 460 (reasonable suspicion that there is contraband in the vehicle justifies greater intrusion unrelated to the traffic stop); *Barahona,* 990 F.2d at 416 ("For a detention to be reasonable, an officer's questions must relate to the purpose of the stop," but "if the response of the detainee and the circumstances give rise to suspicions unrelated to the traffic offense, an officer may broaden his inquiry and satisfy those suspicions," *Terry,* 392 U.S. at 20, 88 S.Ct. at 1879). In this case, the identification check of each of the occupants of the two cars produced further matters besides the improper passing citations that it was reasonable for Trooper Hindman to explore, including the matters of Mr. Wright's expired license and the preparation of a citation for that violation, Ms. Anderson's unserved license suspension notice from the Iowa Department of Transportation, and Ms. Crandall's two "countywide" warrants, which supplied probable cause for her arrest.

If a valid traffic stop has been made, further detention of the vehicle and its occupants does not become unreasonable in length as long as the stopping officer uses diligent efforts to process the stop and further delays are the result of circumstances beyond the officer's control. *White*, 42 F.3d at 460 (delay of one hour and twenty minutes waiting for arrival of drug dog was reasonable where officer acted diligently and delay was caused by remote location of the dog from the site of the stop); *Bloomfield*, 40 F.3d at 916–17 (same where one-hour delay was for drug dog to arrive). The *Bloomfield* decision indicates that an officer acts diligently and that delays do not make a detention unreasonable if, for example, the officer initiates necessary radio communications promptly, including requests for assistance or information; obtaining a proper response generally takes some time; and the delay is reasonable when considered in light of " 'the law enforcement purposes to be served by the stop as well as the time reasonably needed to effectuate those purposes.' " *Bloomfield*, 40 F.3d at 917 (quoting *Sharpe*, 470 U.S. at 685, 105 S.Ct. at 1575).

Here, although the court begins with the subjective impression that the stop took a very long time, the detention was indeed extended by Trooper Hindman's need to initiate various radio checks, for example, on the validity of the warrants for Ms. Crandall, the validity of the suspension notice for Ms. Anderson, and the expiration date of Mr. Wright's license. *Id.* The stop was also extended by the time necessary to obtain results to Trooper Hindman's radio inquiries and the need to generate paperwork of various kinds to process the bonds, notices, and citations. *Id.* All of these activities fit with the law enforcement purposes of the stop and there is no evidence from which this court could conclude that the time they occupied was not reasonably necessary to effectuate those purposes. *Id.*

Even though Trooper Hindman shared with another officer the completion of the citations, each citation took approximately ten to fifteen minutes to fill out. However, the court finds that the most time-consuming part of the stop was the processing of Ms. Crandall's warrants, a matter in which Mr. Morris was also involved. Processing the warrants required not only the generation of the paperwork and its completion, but also extensive radio communications to verify the validity of the warrants, and to make inquiries to the issuing counties concerning their interest in collecting Ms. Crandall if she could not post the scheduled bond, as well as discussions with Mr. Morris concerning payment of the bonds, and preparation of the bond money and forms for mailing. In light of a record demonstrating (1) a number of activities "reasonably related in scope to the circumstances which justified the interference in the first place," *Terry*, 392 U.S. at 20, 88 S.Ct. at 1879; *Cummins*, 920 F.2d at 502, or justified by circumstances giving rise to a reasonable suspicion that inquiries should be broadened, *Johnson*, 58 F.3d at 357–58; *Ramos*, 42 F.3d at 1163; *White*, 42 F.3d at 460; *Barahona*, 990 F.2d at 416; (2) all of which necessarily required time to complete, *Bloomfield*, 40 F.3d at 917; and (3) coupled with the lack of any evidence that Trooper Hindman did not pursue completion of those activities diligently, *id.*, the court concludes that there was no unreasonable detention prior to the issuance of Mr. Morris's citation even though the citation was not issued until approximately one hour and a quarter after the initial stop.

Finally, nothing about the detention prior to the issuance of the citation transformed it into an arrest of Mr. Morris requiring a showing of probable cause. *See Bloomfield*, 40 F.3d at 917. Mr. Morris was not subjected to any intrusion or restraint beyond that necessary for Trooper Hindman to pursue his investigation of the various matters involving the occupants of the two vehicles. *Id.* Mr. Morris remained in his vehicle, he was not restrained in any way, the officers did not impound his vehicle, and nothing further was removed from the vehicle. *Id.* Thus, the least intrusive means of detention reasonably necessary to achieve the purposes of the stop was employed and nothing about the detention here prior to issuance of the citation rises to the level of a *de facto* arrest. *Id.* at 917–18. There was no

unreasonable delay or unconstitutional detention prior to the issuance of the improper passing citation to Mr. Morris.

### 2. Delay after issuance of Mr. Morris's citation

■ Mr. Morris also contends that he was unreasonably detained *after* he was issued a citation and that the subsequent search which revealed the weapons was therefore a constitutional violation. Mr. Morris asserts that in *United States v. Ramos*, 42 F.3d 1160, 1164 (8th Cir.1994), the Eighth Circuit Court of Appeals held that the continued detention of a defendant following the issuance of a minor traffic citation was improper, at least where the defendant had given no inconsistent answers to the stopping officer's questions and there were no objective circumstances that would supply the officer with additional suspicion allowing the officer to expand the scope of the stop. The United States counters that *Ramos* is fact-specific, applicable only in the circumstances of that case which provided no additional basis for an expanded search, but does not state a blanket rule applicable whenever a search follows the issuance of a citation. The United States contends further that the discovery of the small bat and mace, along with an admission that there might be a shotgun in the trunk, provided reasonable suspicion for Mr. Morris's continued detention and the eventual search.

The court concludes that both parties have somewhat missed the mark in arguing at this juncture over the reasonableness of Mr. Morris's continued detention after he had received his citation in terms of whether there were circumstances giving rise to a reasonable suspicion, independent of the initial traffic stop, that a search should be conducted. In the circumstances of this case, the court perceives a prior question to be whether Mr. Morris's continued detention between the issuance of his citation and the search of his car, if detention it was, was reasonable *as part of* the original stop for a traffic violation.

First, the court has considerable doubt that Mr. Morris was detained after he was issued his citation. Although Trooper Hindman did not tell Mr. Morris he could leave, he did return Mr. Morris's identification and gave him the citation, which was the only matter directly involving Mr. Morris in the stop. In an argument raised for the first time in his reply brief, Mr. Morris asserts that he could not leave at that point even if he had wanted to, because his car was sandwiched between the Lincoln and Trooper Hindman's patrol car, and the search of the Lincoln was being conducted directly in front of his car. Thus, he belatedly contends, he could not safely exit the scene. The court is unpersuaded by this argument. Unlike the defendants in *Ramos*, the court does not see in these circumstances evidence suggesting that Mr. Morris did not feel free to leave even after his driver's license and citation had been given to him, and that this feeling on his part was reasonable under the circumstances. *Ramos*, 42 F.3d at 1164. For one thing, Mr. Morris did not testify at the hearing such that the court could assess his testimony concerning what he may or may not have felt about anything. For another thing, there is no evidence in the record to suggest that Mr. Morris's vehicle could not safely exit the scene even if it was the second one in line. The two semi-trailer trucks, much longer vehicles than the cars and the fourth and fifth vehicles in line, were able to leave the scene even after other troopers arrived in their vehicle or vehicles.

■ However, although not for the reasons Mr. Morris now asserts, the court will assume for the purposes of this opinion that Mr. Morris was still being detained after he was issued his citation. At this point, however, the court is not concerned with whether new grounds were presented for continued detention, but whether the detention continued to be justified as part of the original traffic stop. The court reads *Ramos* as holding that the proper scope of a stop for a traffic violation ends when the reasons for the initial stop have been completely processed and no further matters suggesting a broadening of the inquiry have been presented or such further matters have also been processed. *Ramos*, 42 F.3d at 1163 (officer may ask any questions reasonably related to the stop and may expand the scope of his

inquiry if, for example, related questions raise inconsistent answers or the licenses and registration do not check out, but the inquiry must end once the initial stop or suspicions reasonably raised in its course have been investigated). Thus, in *Ramos,* the inquiry had to end after issuance of the citation, because no further matters had given the trooper grounds for expanding the scope of his inquiries. *Id.*

However, *Ramos* only involved the stop of a single vehicle, while the present stop involved two vehicles apparently travelling in company. Assuming that Mr. Morris was still being detained after he received his citation, the troopers were not yet finished processing matters reasonably within the scope of the traffic stop with regard to the occupants of the Lincoln when Mr. Morris received his citation and his license was given back. Thus, the court concludes that the detention of the occupants of both vehicles until all matters reasonably within the scope the traffic stop had been processed was reasonable. *Id.; see also Johnson,* 58 F.3d at 357–58 (traffic stop may be expanded if circumstances give rise to suspicions unrelated to the initial stop); *Ramos,* 42 F.3d at 1163 (circumstances presented in the course of a traffic stop may provide grounds for broadening the inquiry); *White,* 42 F.3d at 460 (circumstances may justify greater intrusion unrelated to the traffic stop); *Barahona,* 990 F.2d at 416 (circumstances may justify expanding inquiries in a traffic stop). Specifically, the reasonable detention of Mr. Morris continued until troopers had finished processing the stop with regard to the Lincoln and its occupants as well as with regard to Mr. Morris's vehicle and its occupants.

██ Yet, this conclusion only postpones the point at which the detention may have

ceased to be reasonable in scope under *Ramos* until the troopers had finished with the occupants of the Lincoln. As soon as the troopers finished processing the citations for the occupants of the Lincoln and returned their identification, as in *Ramos,* there was no longer any legal reason to detain either the occupants of the Lincoln or the occupants of Mr. Morris's car. *Ramos,* 42 F.3d at 1163.[2] At that point, as in *Ramos,* Mr. Morris's license was clean, the vehicle was not stolen, and Mr. Morris had given no inconsistent answers to any questions. *Id.* Unless Trooper Hindman had a reasonably articulable suspicion for believing that the shotgun he had been told was in the trunk of Mr. Morris's car was stolen, continued detention became unreasonable after troopers had finished processing the traffic stop as to the occupants of both the Lincoln and Mr. Morris's vehicle. *Id.*

### B. Reasonable Suspicion For Further Search

██ Although the court did not have to inquire whether the initial stop of Mr. Morris's vehicle was reasonable, it is now squarely confronted with the question of whether the warrantless search of Mr. Morris's vehicle was justified on its own merits unrelated to the initial stop of Mr. Morris's vehicle for a traffic violation. Thus, the court must consider whether Trooper Hindman had a reasonable, articulable suspicion that Mr. Morris's vehicle was carrying contraband or that other criminal activity may have been afoot. *Terry,* 392 U.S. at 30, 88 S.Ct. at 1884–85; *Johnson,* 64 F.3d at 1124 (quoting *Terry*); *Ramos,* 42 F.3d at 1163; *White,* 42 F.3d at 460 (citing *Cummins,* 920 F.2d at 502); *Cummins,* 920 F.2d at 502. " 'Wheth-

---

**2.** The court has not been presented here with any question concerning the constitutional validity of the search of the Lincoln after its occupants had been given their citations and identification. Because the court has not been asked to consider that matter, the court will assume that the search of the Lincoln was valid, and that any delay resulting from that search prior to Trooper Hindman's return to Mr. Morris's car was within the reasonable scope of the traffic stop. Because the court concludes that the critical point in the timeline at which the detention of Mr. Morris may have become unreasonable can only be drawn after the troopers had finished with the traffic stop as to the occupants of the Lincoln, it seems to the court to be immaterial whether that point was reached before or after the search of the Lincoln, because either way, that point had been reached at the time Trooper Hindman returned to Mr. Morris's vehicle and asked for consent to search that vehicle as well.

er the particular facts known to the officer amount to an objective and particularized basis for a reasonable suspicion of criminal activity is determined in light of the totality of the circumstances.'" *United States v. Halls,* 40 F.3d 275, 276 (8th Cir.1994) (quoting *United States v. Garcia,* 23 F.3d 1331, 1334 (8th Cir.1994)); *see also United States v. Pereira–Munoz,* 59 F.3d 788, 791 (8th Cir.1995) (reasonable suspicion is determined in the totality of the circumstances); *Bloomfield,* 40 F.3d at 918 (same); *Cummins,* 920 F.2d at 501 (same).

As this court observed in a recent decision, the standards used to consider whether reasonable suspicion exists are well defined, albeit sometimes difficult to apply. *United States v. Menard,* 898 F.Supp. 1317, 1322 (N.D.Iowa 1995). Those standards have been summarized by the Eighth Circuit Court of Appeals as follows:

> The standard of articulable justification required by the fourth amendment for an investigative, *Terry*-type seizure is whether the police officers were aware of "particularized, objective facts which, taken together with rational inferences from those facts, reasonably warrant[ed] suspicion that a crime [was] being committed." *United States v. Martin,* 706 F.2d 263, 265 (8th Cir.1983); *see also Terry,* 392 U.S. at 20–21, 88 S.Ct. at 1879–80. In assessing whether the requisite degree of suspicion exists, we must determine whether the facts collectively establish reasonable suspicion, not whether each particular fact establishes reasonable suspicion. "[T]he totality of the circumstances—the whole picture—must be taken into account." *United States v. Cortez,* 449 U.S. 411, 417, 101 S.Ct. 690, 695, 66 L.Ed.2d 621 (1981). We may consider any added meaning certain conduct might suggest to experienced officers trained in the arts of observation and crime detection and acquainted with operating modes of criminals. *See United States v. Wallraff,* 705 F.2d 980, 988 (8th Cir.1983). It is not necessary that the behavior on which reasonable suspicion is grounded be susceptible only to an interpretation of guilt, *id.;* however, the officers must be acting on facts directly relating to the suspect or the suspect's conduct and not just on a "hunch" or on circumstances which "describe a very broad category of predominantly innocent travelers." *Reid v. Georgia,* 448 U.S. [438] at 440–41, 100 S.Ct. [2752] at 2754 [65 L.Ed.2d 890]; *United States v. Sokolow,* 831 F.2d 1413 (9th Cir.1987), [*rev'd on other grounds,* 490 U.S. 1, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989) ].

*United States v. Campbell,* 843 F.2d 1089, 1093 (8th Cir.1988); *see United States v. Green,* 52 F.3d 194, 198 (8th Cir.1995) (citing similar standards); *Dawdy,* 46 F.3d at 1427 (holding that "[f]or a *Terry* stop to be considered valid from its inception, 'the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion,'" quoting *Terry,* 392 U.S. at 21, 88 S.Ct. at 1880); *Bloomfield,* 40 F.3d 910, 919 & n. 10 ("subjective perceptions of officers may be factors supporting reasonable suspicion, but suspicion must be objectively reasonable and articulable"). In *Menard,* this court also concluded that more than mere companionship with someone an officer has probable cause to arrest is required in order to search the companion, although companionship is a factor that may be considered in the totality of the circumstances. *Menard,* 898 F.Supp. at 1323–27 (describing the requirement as "propinquity plus more").

Here, the arguments of the government mentioned above, that the discovery of the small bat and mace, along with an admission that there might be a shotgun in the trunk, provided reasonable suspicion for the search of Mr. Morris's vehicle, as well as the further contentions that a reasonable suspicion was created by Mr. Morris's travelling in company with a woman wanted in two counties,[3] do become pertinent, although not persuasive. The government asserts that under these

---

3. Because nothing was found in the search of the Lincoln, the court can leave aside the question of whether or not anything found in the Lincoln could have provided reasonable suspicion to search Mr. Morris's car as well when the two vehicles were travelling in company.

circumstances for Trooper Hindman to have failed to investigate the weapons admitted to be present "would have been tantamount to dereliction of the officer's duty." However, the court concludes instead that Trooper Hindman was acting on nothing but a "hunch" or subjective belief unsupported by objective facts. *Green,* 52 F.3d at 198; *Bloomfield,* 40 F.3d at 919 & n. 10; *Campbell,* 843 F.2d at 1093.

Trooper Hindman testified that he was "curious" about the shotgun, in part because he had found the baseball bat and the mace, and he "felt like it was part of my duties to investigate further as to the shotgun, whether it was stolen or whether it wasn't." Under the standards stated above, mere curiosity is not enough,[4] and neither that subjective belief nor the officer's subjective belief about what it was his duty to do is supported by any objective facts. *See McDonell v. Hunter,* 809 F.2d 1302, 1307 (8th Cir.1987) (reasonable suspicion must be based on "specific objective facts and rational inferences [officers] are entitled to draw from those facts in light of their experience"). The small baseball bat and mace were not contraband and did not suggest that the shotgun admitted to be in the trunk was stolen or in any other way suggest that "criminal activity [was] afoot." *Terry,* 392 U.S. at 30, 88 S.Ct. at 1884; *Johnson,* 64 F.3d at 1124 (quoting *Terry* ); *Ramos,* 42 F.3d at 1163; *White,* 42 F.3d at 460 (citing *Cummins,* 920 F.2d at 502); *Cummins,* 920 F.2d at 502. Thus, there is nothing more than presence in the company of someone an officer had probable cause to arrest, based on outstanding warrants, that can generate a reasonable suspicion of criminal activity in this case justifying a renewed search for weapons in Mr. Morris's car. *Menard,* 898 F.Supp. at 1327. Trooper Hindman specifically eschewed any concern for his safety as prompting the search and indeed the court would not be impressed by such an assertion when the search took place more than an hour after the initial stop and no conduct of Mr. Morris

suggested that he or a weapon locked in his trunk suddenly posed a renewed threat to the trooper's safety. The totality of these circumstances, *see, e.g., Halls,* 40 F.3d at 276, simply does not meet the constitutional requirements for a valid search. But for valid consent, therefore, evidence garnered from the search of Mr. Morris's vehicle would be suppressible.

### C. Consent

■■■■ A search may be constitutionally valid either where it is supported by a reasonable suspicion or by valid consent. *See, e.g., Ramos,* 42 F.3d at 1164 (causal chain between detention lacking basis in reasonable suspicion and evidence recovered as the result of that detention may be broken by consent); *United States v. Miller,* 20 F.3d 926, 930 (8th Cir.1994) (police may search even in the absence of a warrant, probable cause, or reasonable suspicion if they obtain consent from a person with adequate authority), *cert. denied,* —— U.S. ——, 115 S.Ct. 226, 130 L.Ed.2d 152 (1995); *Barahona,* 990 F.2d at 417 (same). The driver of a vehicle, such as Mr. Morris, has adequate authority to consent to a search of the vehicle. *United States v. Eldridge,* 984 F.2d 943, 948 (8th Cir.1993) (citing cases so holding). The validity of the consensual search here depends on the voluntariness of Mr. Morris's consent, whether his consent was tainted by any other Fourth Amendment violation, specifically an unreasonable detention, and whether the search resulting from Mr. Morris's consent exceeded the reasonable scope of that consent.

#### 1. The voluntariness of Mr. Morris's consent

■■■■ A consensual search does not violate the Fourth Amendment if the consent was voluntarily given without coercion. *Johnson,* 58 F.3d at 358 (immediate and voluntary consent to search removes constitutional doubts); *White,* 42 F.3d 457, 459 (8th

---

4. In a vehement dissent, Justice Brennan asserted that "[a]ction based merely on whatever may pique the curiosity of a particular officer is the antithesis of the objective standards requisite to

reasonable conduct and to avoiding abuse and harassment." *United States v. Martinez-Fuerte,* 428 U.S. 543, 577, 96 S.Ct. 3074, 3092, 49 L.Ed.2d 1116 (1976) (Brennan, J., dissenting).

Cir.1994) (consent must be voluntarily given without coercion); *United States v. Cortez*, 935 F.2d 135, 142 (8th Cir.1991) (same), *cert. denied*, 502 U.S. 1062, 112 S.Ct. 945, 117 L.Ed.2d 114 (1992). The government must establish the voluntariness of the consent by the greater weight, or preponderance, of the evidence. *United States v. Matlock*, 415 U.S. 164, 171, 94 S.Ct. 988, 993, 39 L.Ed.2d 242 (1974); *Schneckloth v. Bustamonte*, 412 U.S. 218, 222, 93 S.Ct. 2041, 2045, 36 L.Ed.2d 854 (1973); *Miller*, 20 F.3d at 930; *United States v. Chaidez*, 906 F.2d 377 (8th Cir.1990). This court's determination of whether voluntary consent was given will be reviewed by an appellate court under the clearly erroneous standard. *White*, 42 F.3d at 459; *Miller*, 20 F.3d at 930; *Barahona*, 990 F.2d at 417.

▉▉▉ Consent is voluntary if it is " 'sufficiently an act of free will to purge the primary taint' " of circumstances that would otherwise make the consensual search a violation of the Fourth Amendment. *Ramos*, 42 F.3d at 1164 (quoting *Wong Sun v. United States*, 371 U.S. 471, 486, 83 S.Ct. 407, 416–17, 9 L.Ed.2d 441 (1963)). A person's consent may be inferred from his words, gestures, and conduct. *United States v. Gleason*, 25 F.3d 605, 607 (8th Cir.), *cert. denied*, — U.S. —, 115 S.Ct. 283, 130 L.Ed.2d 199 (1994); *Barahona*, 990 F.2d at 418. In addition to these and other characteristics of the accused, the court may also look at the details of the environment. *Bustamonte*, 412 U.S. at 226, 93 S.Ct. at 2047; *Miller*, 20 F.3d at 930; *Chaidez*, 906 F.2d at 380–81.

### a. Circumstances in which consent was obtained

▉▉▉ Mr. Morris suggests that a number of circumstances here negate the voluntariness of his consent. Specifically, he points to a lack of any written consent, the lack of any

warning that consent did not have to be given, and the lack of any statement that he was free to leave before consent was obtained. In *Barahona* and *Chaidez*, the Eighth Circuit Court of Appeals suggested that the district court also consider the following factors concerning the environment in which the consent was obtained: whether the person was informed of his or her right to withhold consent (or informed of his *Miranda* rights, if applicable); the length of time the person was detained and questioned; whether the person was threatened, physically intimidated, or punished by the police; whether the person relied upon promises or misrepresentations made by the police; whether he was in a public or secluded location. *Barahona*, 990 F.2d at 417; *Chaidez*, 906 F.2d at 381. As to some of these factors, the court has already concluded that the length of time Mr. Morris had already been detained was not unreasonable, and the record demonstrates that the consent was obtained in a public place beside a four lane highway in front of other witnesses. Furthermore, there is absolutely no evidence that the troopers applied any threats or intimidation or promises or misrepresentations to obtain Mr. Morris's consent. Although Mr. Morris seems to suggests that Trooper Hindman's response to his initial refusal to pay Ms. Crandall's bond for the county that would not come collect her suggests that the trooper expected Mr. Morris to do what he said, there is absolutely nothing about Trooper Hindman's "refusal to play a bunch of games" with payment of a bond that could rise to such a coercive level that Mr. Morris's later consent to a search was not voluntary.

▉▉▉ Turning to Mr. Morris's more specific attacks upon the voluntariness of his consent in the circumstances, the court has found no cases holding that written consent to a search is required. Indeed, the clear majority of cases involving consents to searches of vehicles involve only oral consents.[5] Furthermore, a warning that consent

---

5. The court is not suggesting that law enforcement officers should not bother with written consents to searches. Obviously, a written consent to search would greatly assist the government's efforts to establish the voluntariness of any consent by the greater weight of the evidence, and, more importantly, do much thereby to protect the rights of individuals granting consent. For example, because the court has some reserva-

tions about the longstanding rule that the consenting person does not have to be aware of the right to refuse consent, *Bustamonte*, 412 U.S. at 218, 93 S.Ct. at 2043, the court finds use of a written consent form that also advises the consenting person of his or her right to refuse consent would do much to ensure that consents to searches are indeed voluntary.

does not have to be given is not required, *Schneckloth v. Bustamonte*, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973); *Ramos*, 42 F.3d at 1164; *Barahona*, 990 F.2d at 417 ("Awareness of the right to refuse is not necessary for a consent to be voluntary"), although the fact that such a warning is given is a strong indication that consent was voluntary. *Ramos*, 42 F.3d at 1164. Mr. Morris tries to stand this latter proposition on its head, asserting that the fact that no warning was given that he did not have to consent makes his consent involuntary. The proposition is not amenable to such a negative inference from the absence of its stated conditions. Because no warning that consent may be refused is required, *Schneckloth*, 412 U.S. at 218, 93 S.Ct. at 2043, the absence of such a warning means no more than that the court must see if other circumstances suggest the voluntariness of Mr. Morris's consent.

 In *White*, as in the present case, before the officer asked if he could search the stopped vehicle, he first issued the driver a citation, in that case, a warning ticket, and returned his license and other paperwork. *White*, 42 F.3d at 459. In both cases, the driver gave clear verbal assent to the search and no written consent form was executed. *Id.* However, in *White*, the officer also advised the driver that he was free to go before requesting the driver's consent to search the vehicle. *Id.* In the present case, Trooper Hindman testified that, although Mr. Morris was free to leave after he was given a citation and his license was returned to him, he did not specifically tell Mr. Morris that. This distinction between *White* and the present case does not require the court to conclude that Mr. Morris's consent was not voluntary either. Voluntary consent may be given even where a person has already been arrested or is otherwise detained. *United States v. Watson*, 423 U.S. 411, 424, 96 S.Ct. 820, 828, 46 L.Ed.2d 598 (1976); *Miller*, 20 F.3d at 930; *Chaidez*, 906 F.2d at 382.

### b. Characteristics and conduct of the consenting person

 As the court noted, a person's consent may be inferred from the person's words, gestures, and conduct. *United States v. Gleason*, 25 F.3d 605, 607 (8th Cir.1994); *Barahona*, 990 F.2d at 418. Consent may properly be inferred from the purportedly consenting person's facilitating the search or providing assistance during the search. *Gleason*, 25 F.3d at 607; *Barahona*, 990 F.2d at 417–18. It may also be inferred from the conduct and demeanor of the consenting person during the search, including such things as friendly behavior or a lack of hostility, or "chatting" with the officer or others present. *Gleason*, 25 F.3d at 607. The decisions in *Barahona* and *Chaidez* also suggest factors concerning the characteristics of the person consenting to the search that courts should consider to be the person's age, general intelligence, and education, whether he or she is under the influence of any mind-altering substance, and whether the person objected to the search or passively looked on. *Barahona*, 990 F.2d at 417; *Chaidez*, 906 F.2d at 380.

Here, Mr. Morris was nineteen years of age at the time of the search, but Trooper Hindman testified that he appeared to be of average intelligence, to understand all of their discussions, and not to be under the influence of any drugs or alcohol. *Barahona*, 990 F.2d at 417; *Chaidez*, 906 F.2d at 380. The court so finds. Furthermore, Mr. Morris's conduct readily suggests the voluntariness of his consent to the search. *See Gleason*, 25 F.3d at 607; *Barahona*, 990 F.2d at 417–18. Mr. Morris readily assented verbally to the search, then left his vehicle without invitation and unlocked the trunk so that officers could commence the search. *Gleason*, 25 F.3d at 607; *Barahona*, 990 F.2d at 417–18. In this case, Mr. Morris voluntarily assisted with the fold-down spare tire cover, which was an unusual feature of the trunk on the Cadillac. Mr. Morris stood aside, and offered no objection to the search of his vehicle.

 Finally, where the voluntariness of consent depends upon the credibility of witnesses, the district court's determination of credibility is " 'virtually unreviewable on appeal.' " *Gleason*, 25 F.3d at 607 (quoting

*United States v. Adipietro,* 983 F.2d 1468, 1472 (8th Cir.1993)). Here, the court finds Trooper Hindman's testimony that Mr. Morris consented, his testimony about Mr. Morris's apparent intelligence, understanding of matters, and freedom from any mind-altering substances, as well as his further testimony about Mr. Morris's response to his request to search and conduct during the search are entirely credible, as well as wholly unrebutted by any contrary testimony. In the totality of the circumstances, nothing about the environment in which the consent was sought and obtained detracts from the voluntariness of Mr. Morris's consent and Mr. Morris's own conduct and characteristics are clearly indicative of the voluntariness of his consent.

### 2. Was the consent "tainted"?

■■■■ The court will consider next whether an unreasonable detention tainted Mr. Morris's otherwise voluntary consent. An unreasonable detention may taint any consent to a search given by the detainee. *See, e.g., Pereira–Munoz,* 59 F.3d at 791. However, where the detention is supported by a reasonable suspicion, *United States v. Miller,* 20 F.3d 926, 930 (8th Cir.), *cert. denied,* — U.S. —, 115 S.Ct. 226, 130 L.Ed.2d 152 (1994); *Johnson,* 58 F.3d at 357, or the detention is only momentary for the purpose of requesting permission to search a vehicle, *United States v. Harris,* 928 F.2d 1113, 1117 (11th cir.1991), the detention does not taint the consent. *Pereira–Munoz,* 59 F.3d at 792; *United States v. Delaney,* 52 F.3d 182, 187 (8th cir.1995). As the court observed in section III.A., the entirety of Mr. Morris's detention prior to the issuance of citations to the occupants of *both* vehicles was not unreasonable. Although, as the court found above in section III.B., the detention of Mr. Morris following issuance of citations to the occupants of both cars was not supported by any reasonable suspicion, that additional detention was only momentary and was for the purpose of requesting permission to search Mr. Morris's vehicle. *Harris,* 928 F.2d at 1117. Therefore, the court concludes that nothing about the detention tainted Mr. Morris's consent to the

search of the trunk of his vehicle for the guns he had admitted were there.

### 3. Scope of the consent

■■■■ As a final matter, the court will consider whether the scope of the search here exceeded the scope of the consent to that search. The standard for measuring the scope of a suspect's consent under the Fourth Amendment is one of objective reasonableness, *i.e.,* "what would the typical reasonable person have understood by the exchange between the officer and the suspect?" *Florida v. Jimeno,* 500 U.S. 248, 251, 111 S.Ct. 1801, 1803–04, 114 L.Ed.2d 297 (1991); *Illinois v. Rodriguez,* 497 U.S. 177, 189, 110 S.Ct. 2793, 2801–02, 111 L.Ed.2d 148 (1990); *United States v. Sanchez,* 32 F.3d 1330, 1334 (8th Cir.1994), *cert. denied,* — U.S. —, 115 S.Ct. 1119, 130 L.Ed.2d 1082 (1995). A search may not legally exceed the scope of the consent supporting it. *United States v. Casares–Cardenas,* 14 F.3d 1283, 1286 (8th Cir.) (citing *Walter v. United States,* 447 U.S. 649, 656–57, 100 S.Ct. 2395, 2401–02, 65 L.Ed.2d 410 (1980)), *cert. denied,* — U.S. —, 115 S.Ct. 147, 130 L.Ed.2d 86 (1994). Where a person fails to object to a search exceeding the scope of the consent the person has given, the further search is objectively reasonable. *Gleason,* 25 F.3d at 607. Furthermore, a search may be expanded beyond the scope of the consent given if the consent search yields a basis for a reasonable articulable suspicion that additional contraband may be found in places to which the consent did not initially extend. *Casares–Cardenas,* 14 F.3d at 1286.

■■■■ The court's concern with the scope of the consent search here is whether running a check on the serial numbers of the weapons found exceeded the scope of Mr. Morris's consent to look for the weapons he had admitted were in the trunk of the car. In the first instance, the court concludes that it is objectively reasonable to believe that consent to a search for weapons extends to a check on whether those weapons are of the kind and number described by the person who has admitted to their existence, whether

they are legal, whether they are stolen, whether they are being safely transported, and, of course, whether they pose a danger to law enforcement officers or others. This scope of the search is objectively reasonable, because otherwise there would be little point in searching for the weapons at all.

■ However, the court need not rest there. In *Arizona v. Hicks,* 480 U.S. 321, 107 S.Ct. 1149, 94 L.Ed.2d 347 (1987), the Supreme Court held that merely recording serial numbers on items that come within a searching officer's view does not constitute a seizure, because it does not "meaningfully interfere" with the owner's possessory interest in either the serial numbers or the items on which the numbers were found. *Hicks,* 480 U.S. at 324, 107 S.Ct. at 1152. Furthermore, in *United States v. Menon,* 24 F.3d 550 (3d Cir.1994), the Third Circuit Court of Appeals suggested that serial numbers of weapons present a "typical case" in which minimally intrusive inspection supplemented by recourse to a field test or consultation of a database in order to determine whether the object found is legal or illegal does not violate the Fourth Amendment. *Menon,* 24 F.3d at 562. Finally, and most persuasively, the Eighth Circuit Court of Appeals in *United States v. Watts,* 7 F.3d 122 (8th Cir.1993), concluded that recording and checking the serial numbers of weapons does not exceed the scope of an otherwise legal search. *Watts,* 7 F.3d at 126. In *Watts,* the court determined that "[h]aving obtained lawful possession of the firearms," the searching officers were free to take down the serial numbers, and were free to check those serial numbers to determine whether the weapons were stolen. *Id.* at 126–27. The court noted that "[c]hecking the guns' registration via the police radio provided a relatively quick, effective method of determining whether the [guns] might be stolen." *Id.* at 127. Thus, the court concludes here that the check on the serial numbers of weapons discovered in a consent search, particularly where the searching officers did not even seize the weapons prior to the check, but merely recorded the serial numbers, was a minimally intrusive means of determining whether the items were stolen. Thus, the scope of the search here did not exceed the reasonable scope of Mr. Morris's consent. There are therefore no grounds for suppressing any evidence presented by the Mr. Morris's motion to suppress.

## IV. CONCLUSION

Although the defendant has cast the inquiry here principally in terms of how long after a lawful traffic stop is too long before a search can be commenced, the court ultimately concludes that the critical issue is whether the defendant gave valid consent to the search. However, the court has concluded in the process that but for valid consent, the search for and seizure of weapons in this case would not have been proper. The court concludes that the reasonable scope of the detention in this case extended not just until the time the defendant was issued a citation for an improper pass, but until troopers had finished processing the traffic stop as to all occupants of both of the vehicles involved in traffic violations where those vehicles were travelling together. Once troopers had finished processing the stop as to all occupants of both vehicles, however, the court finds no reasonable suspicion in this case for reinitiating inquiries and commencing a search for weapons.

Yet, any detention resulting from continuing inquiries after the traffic stop was completed was only momentary and only for the purpose of obtaining consent to search for a weapon the defendant had already admitted was present. Such a momentary detention is not a constitutional violation. Furthermore, the defendant in this case gave voluntary consent to the search of his vehicle for weapons. Nothing about either the circumstances of that search, nor about the conduct and characteristics of the defendant, casts any doubt on the voluntariness of the defendant's consent. Nor did the momentary detention to request consent, even where it followed a very extended, but reasonable, detention for the purposes of processing the traffic stop, "taint" the defendant's consent. Finally, the court concludes that running a check on the serial numbers of the weapons discovered in the search did not exceed the reasonable

scope of the defendant's consent. There being no grounds to suppress evidence, Mr. Morris's October 12, 1995, motion to suppress is **denied**.

**IT IS SO ORDERED.**